property right in continued employment without due process of law.

█ Under the established Due Process analysis one must consult state law to determine the existence and dimensions of alleged property interests. *Roth v. Board of Regents,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiffs must prove that they have some legitimate expectation of continued employment and that they are more than employees at will. *Bishop v. Wood,* 426 U.S. 341, 345–46, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976).

█ Plaintiffs candidly admit that they have no binding agreement with the State of Missouri that would give them a reasonable expectation of continued employment. Additionally, no statutory source of such an expectation has been demonstrated to the Court. Plaintiffs' sole source of their alleged property interest seems to be Administrative Rule 7.01A which defines "permanent employees" as those with no set expiration term for their appointments. Under Rule 7, an employee who successfully completes a probationary period becomes a permanent employee.

The Court believes plaintiffs had no legitimate expectation of continued employment. No contract or statute would provide this, and Rule 7 merely makes the appointments of Circuit Clerk employees open-ended. If anything, Rule 7 would indicate that employees have *no* fixed tenure in their positions. Missouri law is clear that in the absence of a contract for a definite term of employment or a statutory source creating such a term, an employee serves at the will of his employer. *See Amaan v. City of Eureka,* 615 S.W.2d 414, 415 (Mo. 1981) (en banc). Plaintiffs have failed to show they were deprived of a property right by defendants, and accordingly, the Court will enter judgment for defendants on plaintiffs' Due Process claims.

III. *§§ 1985 and 1986*

█ Although pleaded in their complaint, plaintiffs presented very little evidence on their §§ 1985 and 1986 claims. At any rate, plaintiffs have failed to prove that they were the victims of racial or class based discrimination, one of the elements of an action under § 1985(3). *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Because a § 1986 claim depends on the existence of a valid § 1985 claim, *Williams v. St. Joseph Hospital,* 629 F.2d 448 (7th Cir.1980), plaintiffs' § 1986 is meritless as well. Accordingly, the Court will enter judgment in favor of defendants on plaintiffs' §§ 1985 and 1986 claims.

Dorothy **DEUTER,** Plaintiff,

v.

Richard S. **SCHWEIKER,** Secretary of Health and Human Services, Defendant.

No. 82 C 5393.

United States District Court, N.D. Illinois, E.D.

July 28, 1983.

Michael S. O'Connell, Asst. U.S. Atty., Donna M. Weinstein, Reg. Atty., Steven J. Plotkin, Asst. Reg. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

This is an action pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Secretary of the Department of Health and Human Services (the Secretary) denying plaintiff Dorothy Deuter's (Deuter) applications for disability and disability insurance benefits, 42 U.S.C. §§ 416(i), 423, and for Supplemental Security Income (SSI), 42 U.S.C. § 1381 *et seq.* The parties have filed cross motions for summary judgment: the Secretary urges affirmance of the denial of benefits and Deuter seeks award of her claim. For the reasons hereinafter stated, both motions are denied. The Secretary's finding that Deuter does not have a "severe impairment" is reversed and the action is remanded to the Secretary for further proceedings consistent with this opinion.

Deuter applied for disability insurance benefits on January 4, 1980 and for SSI on May 14, 1980. On her applications, she stated that, because of her hypertension and "fainting spells", she became unable to work on December 3, 1979. Deuter's disability benefits claim was initially denied on March 17, 1980. She requested reconsideration and in September 1980 she was again denied all assistance. Thereafter, upon her request, an Administrative Law Judge (ALJ) considered the claim *de novo.*

After a hearing, at which Deuter appeared and was represented by an attorney, the ALJ issued an opinion in which he held that Deuter had not demonstrated that she had a "severe impairment" and therefore was not disabled as that term is defined in the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d)(1) and 42 U.S.C. § 1382c(a), as implemented by the Secretary's regulations, 20 C.F.R. § 404.1501 *et seq.* and 20 C.F.R. § 416.901 *et seq.*[1] The Appeals Council of

Jerrold S. Zivic, Chicago, Ill., for plaintiff.

---

1. The statutory disability definitions and the implementing regulations with respect to disability insurance benefits and SSI are, for purposes of this action, identical. Hereinafter,

the Secretary's Bureau of Hearings and Appeals adopted the ALJ's conclusion, thereby making it the final decision of the Secretary. The Appeals Council decision was mailed on July 14, 1982 and this action was commenced within six months thereafter.

Deuter is a 50 year old former expeditor or general office worker who apparently has not been gainfully employed at any time since the filing of this application. Her complaints are many and varied. As noted, at the time of her disability application she listed hypertension and fainting spells as the cause of her inability to work. A severe upper respiratory infection was apparently also present at that time. (R. 54, 113) Dizzy spells and poor eyesight are complained of in Deuter's May 14, 1980 "Reconsideration Disability Report". (R. 97–100) And at the hearing before the ALJ, on April 8, 1981, Deuter indicated that she was unable to move or use her arms. (R. 49)

Under the ALJ's questioning at the hearing, Deuter described blackout spells which, she said, were occurring on a daily basis and which resulted in either total loss of consciousness or in loss of vision and inability to speak. (R. 56–57) She indicated that her ability to move her arms was severely restricted (R. 59) and described in detail the limitations on her activities and housework as a result of the blackout spells and the difficulty with her arms. (R. 60–63)

Several doctors have examined Deuter and their observations, findings and diagnoses constitute the bulk of the administrative record. Possibly because of her respiratory difficulties, Deuter was initially examined, on February 7, 1980, by Dr. P. de Silva, M.D., a cardiologist who submitted a form "cardiac report" provided to him by "Disability Determination Services". Dr. de Silva listed Deuter's blood pressure, taken on three occasions, and her pulse rate; he noted, in response to questions printed on the form, an absence of syncopy, myo-

cardial infarction, congestive heart failure or chest pain; and he indicated that an EKG taken of Deuter showed "nonspecific changes". His diagnosis was "essential hypertension" and "exogenous obesity". (R. 114–115) Attached to the cardiac report is a "Physical Capacities Evaluation" form on which Dr. de Silva noted his finding that Deuter is capable of "medium" work that would involve frequent climbing, bending and stooping. (R. 116)

Dr. John E. Roche, M.D., who treated Deuter between May and August 1980, submitted a similar form "epilepsy report". He stated that Deuter was having 30 major motor seizures per month. The seizures were described as primarily nocturnal, focal seizures usually starting in one hand, moving to both hands and then rapidly extending to the whole body. On most occasions, the seizures were accompanied by loss of consciousness. Dr. Roche indicated that his description of Deuter's seizures was not based on his own observations but was "as stated by pt's husband."[2]

Dr. Roche diagnosed Deuter as an epileptic and prescribed Dilantin and phenobarbital. He stated that Deuter took her medicine as prescribed, based on a test of her serum levels, but that she was "still not under control having an average of one seizure a day." (R. 123)

Dr. Roche also referred Deuter to a neurological specialist, Dr. Jack Antel, M.D., who examined Deuter and reported as follows:

On examination she was markedly anxious today and indeed was doing some hyperventilating and felt somewhat light headed and dizzy. This mental state somewhat precluded a complete neurologic exam. The optic fundi appeared normal. There was no cranial or carotid bruits. She seemed to show tunnel vision today rather than a hemianopsia or more specifically a bitemporal hemianopsia. I

solely for simplicity, citation is made only to the disability insurance benefits provisions. In every instance there is a corresponding, materially identical provision pertaining to SSI.

2. Since Deuter was a widow at the time of her disability application (R. 73), this reference is puzzling.

did not detect other focal cranial nerve signs. She did not seem to have focal weakness although there was a tremor of the outstretched hands, more on the right than on the left. Reflexes seemed to be symmetric. The toe response was mainly withdrawal and I could not be sure of this response. Sensory examination was most difficult as she did not respond adequately to pin or position sense on either side.

I would tend to concur with your opinion that there may be an underlying seizure disorder and would certainly begin with the Dilantin therapy.

(R. 125) An electroencephalogram (EEG) accompanying the Roche report was normal. (R. 127)

Dr. Antel wrote again to Dr. Roche on September 16, 1980 to report that he had examined Deuter on that date. He noted that Deuter's EEG was normal and that he was "unable to find focal neurologic signs". Deuter's tremor of the outstretched hand was still present; she reported diurnal spells in which she felt light headed and shaky and then lost consciousness and fell to the ground; Deuter also reported nighttime spells where she started to shake and was unresponsive to attempts to rouse her. Dr. Antel concluded:

> Overall, one is somewhat impressed that there is an anxiety component definitely intermixed with her spells, whether there are true seizures also present is difficult to be certain . . . It may well be that if the higher Phenobarb dose does not do the job that a more intense effort of treating her anxiety symptoms may have to be undertaken.

A third letter from Dr. Antel to Dr. Roche, dated October 7, 1980, indicates that on that date Deuter reported feeling much better. The frequency and severity of her spells were reduced. Dr. Antel concluded that "[o]verall, she seems to be relatively stable at the moment." (R. 131)

In a December 23, 1980 letter to Deuter's attorney, Dr. Antel said that Deuter's "blackout spells" were "brought out, to a great extent, by anxiety" and that "based on my current evaluations and tests," the spells did not indicate an underlying epileptic seizure disorder. Dr. Antel predicted that the frequency of Deuter's blackout spells would increase if she were to reenter the work force and he suggested that her proclivity to the seizures would prevent her normal participation at work. (R. 134)

On April 2, 1981, Deuter was seen by Drs. Andrew Carney, M.D., and Evelyn Anderson, M.D., who subjected her to a "cerebral hemodynamic evaluation", a rather lengthy series of tests designed to analyze the blood circulation to the brain. (R. 141) During the course of carotid compression, a regular part of the evaluation, Deuter suffered a clonic seizure that apparently lasted approximately seventeen minutes. Initially, Deuter was flaccid and unresponsive. Seven minutes after the seizure began, Deuter did not respond to her name. After seven and one half minutes, although she could not speak, Deuter appeared "more aware." After ten minutes, she could talk and recognized Dr. Anderson; her vision was hazy, however, and she did not know where she was. After twelve minutes, she experienced numbness of her legs. And finally, after fourteen minutes, her speech cleared and she knew where she was. (R. 145–146)

Drs. Carney and Anderson concluded that Deuter had an atypical convulsive disorder of uncertain etiology which was precipitated by right carotid compression. Deuter's brain blood flow was normal except for the left superficial temporal artery, which had very high systolic and diastolic velocity. The doctors also noted some right side cervical spine pathology and a right sided mass. (R. 146) Deuter's EEG on April 21, 1981 was again normal for her age both awake and asleep. (R. 147) Dr. Anderson wrote Deuter's attorney on May 13, 1981 and indicated, based on her studies, that, although she could not diagnose Deuter, Deuter was "not capable of being gainfully employed at this time or in the forseeable [sic] future." (R. 148)

The Secretary requested Dr. Jonas Byla, M.D., a neurological surgeon, to examine Deuter. Dr. Byla had another EEG per-

formed on Deuter[3] and then examined her on or before June 18, 1981. He summarized the results of his "neurological examination" in part as follows:

> I haven't the slightest explanation as to this patient's alleged complaints, pain or inability to move her arms, and from neurological point of view I cannot see any neurological deficit or explain her inability to move her arms and a psychiatric evaluation would be the next step, and there appears to be some doubt as to the actual seizures, and I think that a detailed description of her neurologist—Dr. Anderson would be of considerable value, although I doubt that there is any seizure disorder in this case. Previous EEGs and including this present one are within normal limits.
>
> Being unable to diagnose her case, I was also unable to evaluate her disabilities which I doubt that any exist and that this appears to be a psychiatric or psychosomatic problem.

(R. 151) According to Deuter's uncontradicted affidavit, Dr. Byla's examination lasted a total of ten minutes and consisted solely of a series of questions propounded by Byla, a simple test of Deuter's reflexes and Dr. Byla's observation of her gait. (R. 159)

Deuter was hospitalized between August 20 and September 13, 1981 for surgery to remove a large tumor of her right chest wall. The tumor, which was resected by Dr. Carney on August 31, was superficially small and "densely adherent to the overlying pectoralis muscle". Its "deep component" was "larger [than] the size of a small football". The tumor was benign. (R. 167)

While Deuter was in the hospital, she was treated with a "valium i.v. for acute seizures." She was diagnosed on discharge as having a "convulsive disorder" and phenobarbital and Dilantin were prescribed for her on discharge. (R. 162) Dr. Carney, who treated Deuter in the hospital, performed the surgery and examined Deuter after her discharge, wrote to Deuter's attorney on May 20, 1982 that she "suffers from a convulsive disorder which is poorly controlled, Hind Brain Ischemia and paradoxical respiration in the area of a chest wall resection." His letter indicated that Deuter was "not capable of gainful employment." (R. 174)

The ALJ found that Deuter did not have a "severe impairment," 20 C.F.R. § 404.-1521. Accordingly, he concluded that Deuter had not demonstrated her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" and was therefore not "disabled". 42 U.S.C. §§ 416(i), 423(d)(1).

The Secretary's regulations define "an impairment that is not severe" as follows:

> (a) *Non-severe impairment.* An impairment is not severe if it does not significantly limit your physical or mental abilities to do basic work activities.
>
> (b) *Basic work activities.* When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—
>
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.

The regulations further provide that a finding of non-severe impairment, as was made with respect to Deuter, pretermits any need for consideration of an applicant's age, education and work experience: "If you do not have any impairment(s) which significantly limits your physical or mental ability to do basic work activities, we will

---

**3.** The EEG, which was taken on June 13, 1981, was normal. (R. 156)

find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. § 404.1520(c).[4]

The relatively limited parameter of our review is set out in the statute, which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *McNeil v. Califano,* 614 F.2d 142, 145 (7th Cir.1980) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).

Obviously, this is a standard of review that requires careful examination of the record of each individual case to determine its adequacy to support the findings. *Stark v. Weinberger,* 497 F.2d 1092, 1099 (7th Cir.1974). Judge Weinfeld has elaborated the point:

> The evidence " 'must do more than create a suspicion of the existence of the fact to be established' "; thus, while the Court does not substitute its judgment for that of the Secretary, neither does it act as a "rubber stamp" of administrative determinations. If it is found, in " 'scrutiniz[ing] the whole record . . . [that] reliance is placed on one portion of the record in disregard of overbalancing evidence to the contrary, the court may then interfere with the Secretary's conclusion.' "

*Correa v. Secretary of the Department of Health and Human Services,* 501 F.Supp. 236, 237 (S.D.N.Y.1980) (footnotes omitted). And a growing number of decisions emphasize that a disability denial in order to be supported by substantial evidence, must at least express why evidence favorable to the claimant was not credited or was deemed not controlling. *See e.g. Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982); *Holndoner v. Schweiker,* 542 F.Supp. 739,

742 (N.D.Ill.1982); *Garcia v. Califano,* 463 F.Supp. 1098, 1105 (N.D.Ill.1979).

Here, there is very little that directly supports the ALJ's finding that Deuter's ability to perform basic work activities is not significantly limited by the seizures or blackout spells from which she suffers. Drs. de Silva and Byla alone opined that Deuter had no disabling impairment. But Dr. de Silva's "cardiac report", which concluded that Deuter was capable of "medium" work, gave no indication at all that that doctor even considered the possibility that Deuter might suffer from epilepsy or some other seizure disorder. And Dr. Byla's conclusion, based on a single, superficial examination of Deuter, that her "alleged complaints" were inexplicable to him and therefore probably nonexistent, does not have great probative weight.

Virtually all of the remaining medical evidence in the record tends to favor the contrary conclusion, that Deuter was suffering from a severe impairment. Dr. Roche, who is Deuter's regular or treating physician, diagnosed her as having an uncontrolled epileptic seizure disorder. Dr. Antel, a specialist in neurology, initially concurred in Dr. Roche's assessment. However, after seeing Deuter repeatedly and after reading her EEG, which was normal, Dr. Antel revised his opinion and stated that Deuter's "spells" or seizures were probably the result of anxiety rather than some somatic disorder. But Dr. Antel never questioned that the spells were actually occurring or their frequency and he indicated that the existence of a somatic seizure disorder was "not absolutely preclude[d]". Dr. Antel went on to state, in fairly clear terms, that, despite medication, Deuter's anxiety spells or seizures, whatever their origin, would seriously interfere with her ability to perform should she reenter the work force. (R. 134)

---

**4.** An impairment which is found to be severe may be sufficiently severe to "meet [ ] or equal [ ] a listed impairment in Appendix 1," 20 C.F.R. Part 404, Subpart P, Appendix 1, in which case it is deemed disabling without more. 20 C.F.R. § 404.1520(d). Other "severe impairments", that do not satisfy any of the requirements in Appendix 1, may still be found disabling if they prevent a claimant from doing past relevant work, 20 C.F.R. § 404.1520(e), and from doing any other work, 20 C.F.R. § 404.1520(f).

Dr. Carney, who witnessed a seizure or spell during the course of his testing of Deuter's circulation to the brain, was convinced that she had a seizure disorder, though of "uncertain etiology". Dr. Carney also resected a large, benign tumor from Deuter's chest wall. And he stated that, in his opinion, Deuter had been incapable of working for a year prior to that operation. (R. 161) Dr. Anderson, who also witnessed the seizure and was involved in the testing and diagnosis of Deuter, concurred in Dr. Carney's opinion that Deuter was incapable of working. (R. 145)

Despite the foregoing, the ALJ ruled that Deuter did not have a disabling seizure disorder. In so concluding, the ALJ relied in part on the supposed fact that no doctor ever witnessed one of Deuter's seizures and that the seizures therefore "have not been substantiated". (R. 28) This finding, which is belied by the clinical record of Drs. Carney and Anderson's observations, is *clearly erroneous* and cannot stand.

At the hearing, Deuter testified as to her subjective feelings of severe and disabling pain, testimony which, if credible, was relevant and probative. *See e.g. Johnson v. Weinberger,* 525 F.2d 403, 407 (7th Cir. 1975). The ALJ discredited the subjective pain testimony because "her activities at home . . . do not appear to be restricted." (R. 28) In fact, however, the only evidence in the record indicates, without contradiction, that Deuter's home activities are seriously restricted: Deuter does not walk outside the house unaccompanied (R. 60); she cannot cook without assistance (R. 61); she cannot shop (R. 62); and she cannot bathe *or dress herself (R. 63). The fact that,* despite these restrictions, Deuter apparently is still able to vacuum without assistance and to load the dishwasher (R. 62), does not

support or warrant the ALJ's blanket finding that her "activities at home . . . do not appear to be restricted." That finding is also *clearly erroneous.*

Finally, the ALJ dismissed the medical evidence of Deuter's physicians with the following comment:

> The Administrative Law Judge is aware that at least one physician was of the opinion that the claimant was disabled. This opinion was not based on clinical and laboratory data and has been given little weight by the Administrative Law Judge.

(R. 28) This is also inaccurate. Drs. Carney and Anderson's conclusion was based on their observation of one of Deuter's seizures and their testing and treatment before and after Dr. Carney performed Deuter's August 1981 operation. Dr. Antel's observations and findings are detailed in a series of letters that describes his neurological examinations. While the ALJ's assessment may fairly describe the "epilepsy report" of Dr. Roche, who was also one of Deuter's treating physicians,[5] it does not adequately deal with the well documented conclusions of Dr. Antel and Drs. Carney and Anderson.

■ In his opinion, the ALJ also stressed Deuter's apparent refusal to schedule a psychiatric consultative examination shortly after her post-operative discharge. (R. 28) It is of course true—and a necessary corollary of the statute's allocation of the burden of proof to the disability claimant, 42 U.S.C. § 423(d)(5)—that a claimant who fails to appear at a consultative examination and who, as a result, is unable to show a disability, may have his claim dismissed. *See* 20 C.F.R. § 404.1518. But here, even without the psychological evidence, the record overwhelmingly establishes that Deuter suffers from poorly controlled and unpre-

---

**5.** It is established law in this circuit that the clinical conclusions of a disability claimant's treating physician, as opposed to those of a doctor who only saw the claimant once or merely examined his medical file, are entitled to substantial weight. *Allen v. Weinberger,* 552 F.2d 781, 786 (7th Cir.1977). The Seventh Circuit has recognized that physicians with longstanding relationships with their patients may have "incentives" to support disability ap-

plications, *Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982), and it is now understood that the treating physician's greater familiarity with the claimant's history is probative to the extent it is supported by "medically acceptable clinical and diagnostic techniques," 20 C.F.R. § 404.1526. *Whitney v. Schweiker, supra,* 695 F.2d at 789. It was therefore not improper for the ALJ to accord Dr. Roche's report "little weight".

dictable seizures or blackout spells that interfere with her ability to perform basic work activities as defined in 20 C.F.R. § 404.1521(b). There is not substantial evidence in the record to support the ALJ's contrary finding, which we reverse.

On the contrary, it is apparent and we find that Deuter has a severe impairment. Accordingly, the Secretary will be required on remand to determine whether the impairment meets or equals a listed impairment in Appendix 1. 20 C.F.R. § 404.1520(d).[6] If it does, the Secretary should find that Deuter is disabled. If it does not, the Secretary must determine whether, despite the severe impairment, Deuter is capable of performing her past work or other work in the national economy. *See* 20 C.F.R. § 404.1520(e) and (f).

6. One of the impairments listed in Appendix 1 is "epilepsy". In relevant part, Appendix 1 provides:

> 11.00 A. *Convulsive disorders.* In convulsive disorders, regardless of etiology, severity will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available. Documentation of epilepsy should include at least one electroencephalogram (EEG).

> Under 11.02 and 11.03, a severe impairment is considered present only if it persists despite the fact that the individual is following prescribed anti-convulsive treatment. Adherence to prescribed anti-convulsant therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.

> . . . .

> 11.02 *Epilepsy—major motor seizures (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment.* With:

> A. Diurnal episodes (loss of consciousness and convulsive seizures); or

*Conclusion*

For the reasons stated, the ALJ's finding that the plaintiff does not have a "severe impairment" is reversed.[7] This action is remanded to the defendant Secretary for further proceedings consistent with this opinion.

> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

> 11.03 *Epilepsy—minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

On remand, the ALJ must consider whether Deuter's convulsive disorder, which one physician has diagnosed as epilepsy, is documented by sufficient findings to warrant the conclusion that it equals or meets the 11.02 or 11.03 listings. *See* 20 C.F.R. § 404.1525(c) and (d). In this connection, we note that the apparent intention of the language in the Appendix, that documentation of epilepsy "*should*" include an EEG, is not absolutely to require an abnormal EEG to support a finding of epilepsy. If it were, it would be medically invalid, since not all persons who have seizures also have abnormal EEGs.

7. We are moved to observe, as we have previously, *Holliday v. Schweiker,* 563 F.Supp. 1272 at 1282 (N.D.Ill.1983), that the ALJ's opinion appears to have been written to substantiate a pre-conceived conclusion, even to the extent of misstating the record on several basic findings. Whether this is the result of agency pressure to reduce disability benefit payments or bias of the ALJs involved, it is distressing to review opinions which are so clearly erroneous in light of the record. This is not the way judicial responsibility should be discharged.