**Barbara BRADLEY, Plaintiff,**

**v.**

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.**

**Civ. No. 86–1064.**

United States District Court, W.D. Arkansas, El Dorado Division.

May 8, 1987.

Larry W. Chandler, Magnolia, Ark., for plaintiff.

Larry McCord, Fort Smith, Ark., for defendant.

## OPINION

RICHARD S. ARNOLD, Circuit Judge, Sitting by Designation.

This is a petition for judicial review under 42 U.S.C. § 405(g) of the final decision of the Secretary of Health and Human Services. The plaintiff, Mrs. Barbara Bradley, had applied for social-security benefits as a disabled widow under 42 U.S.C. § 402(e). An Administrative Law Judge determined that she was not entitled to benefits, and her request for review of that decision was denied by the Appeals Council on March 10, 1986. The decision of the ALJ therefore stands as the final decision of the Secretary. Before the Court are the administrative record and cross motions for summary judgment.

## I.

In order to qualify for social-security benefits as the widow of a wage earner, a person: (1) must be the widow of a wage earner who died fully insured; (2) must not be remarried; (3) must be at least 50 years old; (4) must be under a disability as defined in 42 U.S.C. § 423(d); and (5) must have become disabled within seven years after the latest of the date of death of the wage earner, expiration of mother's benefits, or expiration of previous widow's benefits. 42 U.S.C. § 402(e).

Mrs. Bradley is over 50 years of age, is the widow of a fully insured wage earner, and has not remarried. She last received mother's benefits in September of 1983, and therefore is well within the seven-year period. The only matter in dispute is whether she is disabled within the meaning of 42 U.S.C. § 423(d).

## II.

Mrs. Bradley bases her claim on two ailments. One is a focal-seizure (localized) form of epilepsy; the other is arthritis of the neck and lower back.

Because the Court concludes that Mrs. Bradley has successfully carried her burden of proving that she is disabled on account of her epilepsy, it will not be necessary to discuss whether she would also be considered disabled because of arthritis.

Mrs. Bradley has suffered for a number of years from a localized form of epileptic seizure. She was first diagnosed in 1978 as having "focal seizures" which affected her left arm and the left side of her face. When first diagnosed, she had such episodes about once a week. She was prescribed a combination of anti-convulsive drugs (Tegretol, Dilantin, and Phenobarbitol). This combination effectively controlled her seizures, but had the unfortunate side effect of causing "marked sedation to the point that the patient is not able

to take care of herself." Administrative Record (A.R.) 101. In order to minimize this effect, her treating physician limited her medication to a combination of Tegretol and Phenobarbitol. As a result, he stated: "we have been content to let her have the focal seizure more frequently, hoping that we have prevented some of the more generalized tonic-clonic seizures." *Ibid.* Despite medication, Mrs. Bradley's seizures had increased by 1985 to a frequency of about three per day. A.R. 100.

Mrs. Bradley described a typical seizure pattern as follows: "I get weak and there is a pounding in my head like a big heart beat. My left arm starts jerking and then it goes to my head. I have to cough and my mouth jerks so that I can't talk for 3–5 minutes...." After one of these episodes, she is "weak and shaky" for some time. A.R. 69. Mrs. Bradley's medical history shows that her epileptic condition is aggravated by stress and exertion. When she experiences emotional stress or physical exertion, she is prone to suffer clusters of seizures despite her medication. On occasion, she has as many as thirteen or fourteen seizures in one day. A.R. 103.

Mrs. Bradley underwent a series of tests in 1978, when she was first diagnosed as having epilepsy. The tests included an electroencephalogram (EEG), the results of which were apparently within normal limits. A cerebral arteriogram, confirmed by a pneumoencephalogram, disclosed the presence of a mass lesion on the right side of her brain, accompanied by "marked edema" (swelling). Computerized axial tomography (CAT) scans revealed numerous calcifications (hardening of brain tissue due to the deposition of calcium) in both hemispheres of the brain. A.R. 78. Subsequent CAT scans done through 1985 have shown areas of calcification, particularly on the right side of the brain. A 1981 report stated that several electroencephalograms had been normal. The record, however, does not include any reports of such tests.

The several physicians who have treated Mrs. Bradley have agreed that there is a relationship between her abnormal CAT scans (showing lesions and calcifications in the right hemisphere of the brain) and her left-sided focal epileptic seizures. One report refers to a "prior neurological injury," A.R. 101, although Mrs. Bradley is unaware of any head injury which might have caused brain damage.

In addition to the increased frequency of seizures, Mrs. Bradley is reported by her personal neurologist as having a progressive weakening of her left arm and leg, accompanied by a loss of coordination, and a possible developing speech defect, all attributable to her repeated seizure activity. Mrs. Bradley and her daughter testified as to subjective complaints of weakness, nervousness, and feeling "druggy and draggy" because of the medication. She is unable to do yard work, to cook, or to do heavy housework requiring the coordination of both hands. She does drive her car for short distances, and walks about three miles per day (as directed by her physician), but will not walk unaccompanied because she falls.

On August 29, 1985, Mrs. Bradley was seen by Dr. Charles W. Armistead, a neurologist, for a consultative examination requested by the Social Security Administration. Dr. Armistead reviewed her medical history and interviewed Mrs. Bradley, performing an office examination of neurological functions. No EEG or CAT scan or other tests were done. The neurologist reported no localized motor weakness or other objective neurological deficit, but concluded that Mrs. Bradley suffered from a

> [h]istory of focal motor seizures involving the left upper extremity and face, poorly controlled with Tegretol and Phenobarbitol, occurring almost daily and sometimes multiple times per day lasting about three minutes, not associated with alteration of consciousness or loss of postural control, etiology undetermined, but associated with abnormal Cat Scan showing multiple intracranial calcifications and with subjective complaints of weakness in the left upper extremity.

A.R. 104. Mrs. Bradley was also seen on September 3, 1985 by Dr. Robert S. Bell, an orthopedist, at the request of the Administration. Dr. Bell reported "definitive objec-

tive evidence" of left upper extremity and left lower extremity weakness, attributable to her history of seizures. A.R. 106. He estimated her left-side strength at 50 per cent. of normal. *Id.,* at 105.

### III.

The only question before the Court is whether there was substantial evidence on the record considered as a whole to support the ALJ's decision that Mrs. Bradley was not disabled on account of her epilepsy.

### A.

The standard of review of an administrative adjudication is whether it is supported by substantial evidence on the record as a whole. This is somewhat more probing than the "substantial evidence" test which is used by an appellate court when reviewing the fact-finding of a jury. *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987). While this Court will not second-guess a reasonable choice between two fairly conflicting views of the evidence (even if the Court, proceeding *de novo,* would have preferred the other choice), it will canvass the entire record to ensure that the ALJ in fact made such a reasonable choice. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). Thus, it is not enough for the reviewing court simply to search the record for some evidence which will support the ALJ's conclusion. *Parsons v. Heckler,* 739 F.2d 1334, 1339 (8th Cir.1984). The Court must also review that evidence which "fairly detracts" from the ALJ's conclusion. *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464. The weighing of conflicting evidence is generally a matter of fact-finding for the ALJ, and will not be disturbed on review if the result is one which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971),

quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). But there are occasions when the bulk of the evidence is transparently one-sided against the ALJ's decision. In those instances, the reviewing court must reverse the administrative determination on the ground of unreasonableness. See *Gavin,* 811 F.2d at 1199–1201, and see generally, *Deuter v. Schweiker,* 568 F.Supp. 1414 (N.D.Ill.1983).

### B.

"Disability" is defined for present purposes in 42 U.S.C. § 423(d):

(1) The term "disability" means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...

\* \* \* \* \* \*

(2) For purposes of paragraph (1)(A)—

(A) ...

(B) A widow ... shall not be determined to be under a disability (for purposes of section 402(e) or (f) of this title) unless ... her physical or mental impairment or impairments are of a level of severity which under regulations prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity.

(C) ...

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.[1]

---

**1.** The standard of disability for widows is stricter than that for primary wage earners. A wage earner is disabled if, on account of the impairment, he or she can no longer perform his or her former job and also cannot do any other substantial gainful work which exists in the national economy. The worker's age, past work experience, and education are considered. 42 U.S.C. § 423(d)(2)(A). A widow, on the other hand, must show that she cannot perform *any* gainful work (whether or not it is substantial or present in the national economy), and must

The regulations referred to in the statute are found in 20 C.F.R. § 404.1578. They read as follows:

(a) We will find that you are disabled and pay you widow's or widower's benefits as a widow, widower, or surviving divorced spouse if—

(1) Your impairment(s) has specific clinical findings that are the same as those for any impairment in the Listing of Impairments in Appendix 1 *or are medically equivalent to those for any impairment shown there;* [and]

(2) Your impairment(s) meets the duration requirement.

(b) However, even, [sic] if you meet the requirements in paragraphs (a)(1) and (2) of this section, we will not find you disabled if you are doing substantial gainful activity. (Emphasis supplied.)

Appendix 1, referred to in the regulation, provides a standard for determining whether a claimant is sufficiently disabled to qualify for benefits. A relevant portion of the descriptive standard reads as follows:

11.03 Epilepsy—minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment, with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Part 404, Subpart P, Appendix 1.

### IV.

■ In concluding that Mrs. Bradley is not disabled, the ALJ was persuaded in part by the fact that the standard in Appendix 1 requires that epilepsy be documented by EEG tracings of typical abnormal brain activity. The record does not show that any EEG's have been done on her since at least 1981. Those done before that time apparently revealed no abnormalities. But while EEG documentation is an important means of demonstrating that the seizures are caused by an identifiable abnormality in the brain, it is not the only means. In this case, Mrs. Bradley's medical records consistently show that CAT scans and other tests located calcifications and lesions in the right hemisphere of her brain. All the physicians who treated her, including the consultants for the Secretary, linked these physical changes in brain tissue to her seizures. The condition which is disabling under the standard is epileptic seizures, not abnormal EEG traces; here, the fact of recurring seizures has been established, and their severity, frequency, and characteristics are described in detail. While abnormal EEG traces have not been obtained, the objective diagnostic function of the EEG has been provided through other objective means.[2] The ALJ placed undue stress on the absence of a particular diagnostic measure, while disregarding the overwhelming weight of evidence of an actual disabling condition.

The disability standard specifies that seizures, in order to be disabling, must be accompanied or augmented by "alteration of awareness or loss of consciousness and transient postictal [post-event] manifestations of unconventional behavior or significant interference with activity during the day," app. 1, sec. 11.03. The ALJ concluded that Mrs. Bradley does not meet this standard.

The Court agrees that Mrs. Bradley does not lose consciousness during a seizure and

---

make this showing through medical evidence alone. 42 U.S.C. § 423(d)(2)(B).

**2.** Disability standard 11.00 A, which provides guidance for the evaluation of all convulsive disorders, including focal seizures, stresses that the key to diagnosing disabling epilepsy is the detailed description of a typical seizure; documentation through EEG, while recommended, is apparently not a prerequisite. The standard states "[a]t least one detailed description of a typical seizure *is required,*" while "[d]ocumentation of epilepsy *should include* at least one electroencephalogram (EEG)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 11.00 A (emphasis added). Since seizures are transient phenomena, the abnormal electrical activity associated with them may not show up on an EEG if the patient is not having a seizure when the trace is done. See *Deuter v. Schweiker,* 568 F.Supp. 1414, 1421 n. 6 (N.D.Ill.1983).

does not experience unconventional behavior manifestations afterwards. But the evidence is substantial that she suffers an "alteration of awareness." The ALJ relied specifically on the flat statement of Dr. Armistead (the consulting neurologist requested by the Secretary) that Mrs. Bradley suffered from no "alteration of consciousness." His conclusion was based on a single office visit and a review of her medical file. Tending to contradict that conclusion, however, is Mrs. Bradley's testimony (not expressly discredited by the ALJ) and the reports of her treating physicians, which span a period of several years. This evidence shows that during a seizure she is unable to speak and experiences alterations in her sense of hearing. Immediately after a seizure, she is so exhausted and "shaky" that she is unable to resume her normal activities for a period of half an hour or so. Even those normal activities are severely limited because of nervousness and weakness which she attributes to the effects of the medicine which she takes to mitigate the seizures.

The evidence is also substantial that Mrs. Bradley's day-to-day activities are significantly interfered with, due to the combination of effects of the seizures, the medication, and the progressive weakening and loss of motor control resulting from the disorder. The disability standard states that "[w]here adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed." App. 1, sec. 11.00 A. Mrs. Bradley's treating physicians have been faced with a Hobson's choice: either they mitigate her epileptic disorder through the prescription of combinations of powerful drugs, with the result of incapacitating her through the combined sedative effect, see A.R. 101; or they avoid the drug effect and allow her to endure many seizures daily. *Ibid.* Either of these courses would no doubt be disabling under any standard. Instead, her doctors have attempted to follow a middle course of conservative medication. As a result, Mrs. Bradley avoids the extremes of constant sedation and multiple seizures, but experiences some of both.

Mrs. Bradley's seizure disorder, considered by itself, may not in every respect meet the standard, strictly construed. However, the standard is not a checklist; it is rather a guide to the exercise of administrative judgment. A claimant can be deemed disabled either by meeting the standard or by proving a disability which is equivalent to one described in the standard. 20 C.F.R. § 404.1578. The ALJ did not expressly take into account the combined effect of her seizure disorder along with the impairments resulting from the mitigating medication. When all the record is considered, it is clear that Mrs. Bradley suffers from an impairment equivalent to the epileptic disorder described in app. 1., sec. 11.03.

The motion of the Secretary is therefore denied, the motion of the claimant is granted, and the cause is remanded to the Secretary for computation and payment of benefits.