872 F.2d 1028
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Yvetta SELPH, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 88-5831.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1989.
 
 Before BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges, and BARBARA K. HACKETT, District Judge*.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Yvetta Selph ("claimant") appeals from a summary judgment entered by the district court upholding the Secretary of Health and Human Services' ("the Secretary") determination that she was not disabled and, therefore, not entitled to Supplemental Security Income benefits ("SSI"). The principal question on appeal is whether there is substantial evidence to support the Secretary's conclusion that claimant does not suffer from a severe impairment which meets or equals a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1. For the reasons that follow, we answer this question in the negative, reverse the judgment of the district court, and remand this case for an award of benefits.
 
 I.
 
 2
 Claimant filed an application for SSI on March 28, 1984. Her claim was denied initially and upon reconsideration. After a requested hearing, an Administrative Law Judge ("ALJ") issued a decision denying benefits. On July 9, 1985, the Appeals Council refused to grant claimant's request for review. Claimant then filed an action in the district court. Upon the Secretary's motion, the matter was remanded pursuant to the Social Security Disability Benefits Reform Act of 1984 for reconsideration of an alleged mental impairment.
 
 
 3
 On remand, the ALJ evaluated the claimant's mental condition under the new regulations and issued a recommended decision on September 5, 1986, finding the claimant not disabled. On December 31, 1986, the Appeals Council adopted the recommended decision of the ALJ. The claimant again filed an action in the district court. The United States Magistrate issued a Report and Recommendation finding that the Secretary's decision was supported by substantial evidence. On June 23, 1988, the district court adopted the Magistrate's Report despite the claimant's objections. This timely appeal followed.
 
 
 4
 Claimant was born on August 12, 1936. She was forty-seven years of age when she filed her application for SSI and fifty years of age when the Appeals Council issued the Secretary's final decision. She has a high school education with past work experience that is classified as unskilled. Claimant has previously worked as a dishwasher, a cook, food server, and janitor. She last worked in the fall of 1983. Claimant contends that she is disabled because of the residuals of two brain surgeries and subsequent radiation therapy, seizures, head pains and headaches, loss of sensation in her left hand, visual impairment, bursitis, and chest pain.
 
 
 5
 Following a visual decline in 1957, tests revealed that claimant had a malignant brain tumor "where the eye nerves cross." J.A. at 152. A right frontal craniotomy was performed. Postsurgery radiation therapy resulted in nerve damage and the loss of hearing in her right ear.
 
 
 6
 In February of 1984, claimant again suffered a visual decline in her right eye. A CT scan revealed "an extensive, multiple, irregularly lucent lesion ... occupying the hemisphere in the frontal and temporal lobes on the right." J.A. at 152. The lesion was originally diagnosed as "a malignant intercerebral tumor." Id. A craniotomy was performed on February 29, 1984. A cyst wall biopsy was performed. It was "negative for tumor but consistent with radiation necrosis with cyst formation. The cyst was drained at surgery." Id. Claimant was discharged on March 10, 1984.
 
 
 7
 On March 27, 1985, claimant's treating physician, Dr. Rex Arendall, reported the permanent side effects of the lesion and two brain surgeries. He stated that claimant suffered a loss of sensation on the left side of her body, some loss of visual acuity, and a seizure disorder. Her doctor stated that "[t]hese symptoms are permanent and in all likelihood will be progressive in nature. [Claimant] will require Dilantin therapy on a permanent basis for her seizure disorder." J.A. at 189. He stated that claimant's complaints of weakness, dizziness and a general feeling of malaise were the result of her brain's exposure to radiation in the past. In her doctor's opinion, "it is surprising that she is still alive[.]" Id. From December 12-15, 1985, claimant was hospitalized for the successful removal of nonmalignant skin carcinomas on her scalp.
 
 
 8
 The ALJ concluded that the medical evidence established that claimant has borderline intelligence, some depression and anxiety, has a status-postradiation cyst of the brain, and a basal carcinoma of the left temple, with other skin carcinomas, a loss of hearing in her right ear, a history of seizures, and decreased visual acuity. Without analysis or explanation, the ALJ concluded that none of these conditions equaled a listed impairment nor were they in combination a medical equivalent of an impairment listed in Appendix 1.
 
 
 9
 At the hearing held on June 27, 1986, the vocational expert testified after hearing claimant's testimony. In addition to limiting the claimant to light work, he considered the following nonexertional limitations: a visual impairment that would prevent precision work and that causes depth perception problems; a hearing deficit; a mild seizure disorder where the claimant does not lose consciousness and can hear and speak; inability to work around moving machinery; and a mental impairment including a borderline IQ and mild depression, both of which cause difficulty with mental stamina, difficulty with being in crowds, difficulty with interpersonal stress, and difficulty with personal interaction. He also limited the claimant to unskilled work. He identified the jobs of cafeteria line worker, cook-companion, industrial stamper, and packing and/or boxing in women's hosiery as jobs that claimant could perform despite these limitations, and testified that these jobs exist in significant numbers. The ALJ, accepting the vocational expert's testimony, concluded that claimant retained the residual functional capacity to perform a significant number of jobs in the national economy and was therefore not disabled.
 
 II.
 
 10
 Claimant contends that she has established that she suffers from an impairment that meets or equals the one at 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 11.18 (1988). Section 11.18 provides:
 
 11.18 Cerebral trauma:
 
 11
 Evaluate under the provisions of 11.02, 11.03, 11.04 and 12.02, as applicable.
 
 
 12
 (emphasis supplied). Claimant contends she qualifies under section 11.03, which provides:
 
 
 13
 11.03 Epilepsy--Minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.
 
 
 14
 The Secretary contends that the claimant fails to meet section 11.03 because (1) the record does not contain an EEG, and (2) claimant's seizures are not as severe as those contemplated by the Listings.
 
 
 15
 Initially, we hold that an EEG is not required in this case. This is not a situation in which a claimant is seeking to establish epilepsy under section 11.03. Instead, claimant is seeking to establish disability because of a cerebral trauma, which is evaluated under the provisions of section 11.03 as applicable. The requirement that a seizure be documented by an EEG is a diagnostic requirement for individuals alleging epileptic seizures. While section 11.00(a) explicitly states that "documentation of epilepsy should include at least one electroencephalogram (EEG)," courts have excused the abnormal EEG requirement on occasion. See Braswell v. Heckler, 733 F.2d 531, 533-34 (8th Cir.1984) ("[A] look at the medical literature cautions that the EEG's value in diagnosis should not be overrated...."); Deuter v. Schweiker, 568 F.Supp. 1414, 1421 (N.D.Ill.1983) (EEG documentation language in section 11.03 cannot be read absolutely to require an abnormal EEG to support a finding of epilepsy, or it would be medically invalid). In this case, where a claimant alleges disability due to the cerebral trauma caused by two different brain surgeries, and where her seizures are documented by an uncontroverted treating physician's records, no purpose is served by requiring an EEG. In our view, an EEG is not required by section 11.18 when, as in this case, the Secretary does not dispute the existence of a seizure disorder.
 
 
 16
 The Secretary argues that claimant's seizures are not as severe as those contemplated by the listings. Section 11.03 requires (1) that the seizures occur more frequently than once a week in spite of at least three months of prescribed treatment, (2) that there be either alteration of awareness or loss of consciousness, and (3) that there be either transient postictal manifestations of unconventional behavior or significant interference with activity during the day.
 
 
 17
 The Secretary initially contends that the seizures do not cause alteration of awareness or loss of consciousness because claimant testified that her seizures are lighter than they used to be, she only gets nervous for two to three minutes and usually sits down and tries to relax, she knows what is going on around her, she can hear what is going on around her, and she can talk with a different sounding voice. In our view, however, the Secretary is putting too strict a construction on alteration of awareness. In focusing on the fact that claimant is still somewhat aware of what is going on around her during a seizure, the Secretary is making no distinction between "alteration of awareness" and "loss of consciousness."
 
 
 18
 Moreover, the claimant's treating physician has reached a contrary conclusion regarding the residuals of the two brain surgeries that is uncontroverted. Dr. Arendall's reports are the only medical evidence in the record relating to the residuals of her surgeries. The Secretary relies on reports from a doctor treating her for skin cancer, an ophthalmologist, and several psychiatric examinations. Those reports are not, however, concerned with the residuals of her brain surgeries.
 
 
 19
 Generally, while a treating physician's opinion is not competent to make the ultimate disability determination, his or her opinion is entitled to great weight and should prevail absent serious question. See King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984); Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978). However, the Secretary is not bound by a treating physician's opinion when it is contradicted by substantial evidence, Hardaway v. Secretary of Health and Human Servs., 823 F.2d 922, 927 (6th Cir.1987), or if it is not supported by sufficient medical data. Landsaw v. Secretary of Health and Human Servs., 803 F.2d 211, 213 (6th Cir.1986).
 
 
 20
 Claimant's treating physician and surgeon stated on July 21, 1986, that since her craniotomy in 1984, "she has had problems with headaches and seizures." J.A. at 312. He stated that her complaints of "no energy" and of tiring "after doing light housework" are "due to her seizure medications." Id. He further reported that
 
 
 21
 she has radiation necrosis changes in her brain which will cause progressive loss of brain tissue and will lead to progressive problems with seizures, weakness and possibly paralysis. She is susceptible to psychomotor seizures which would cause alterations in her sense of awareness without total loss of consciousness. This could cause her to perform fugue-like maneuvers which would lead to automative behavior without her being aware of what she was doing. This would be dangerous for her in terms of any assembly line work and certainly she should not drive. This would also alter her sense of her environment, both visually and might affect her hearing and speech.
 
 
 22
 Id. (emphasis supplied). Dr. Arendall also concluded that
 
 
 23
 her brain changes would cause her to have akinetic mutism features where she would have a very flat affect with a bland personality, slow speech and would cause her to be interpreted by others as being dull and lacking motivation or initiative. This would be due to her brain injury and not to any emotional problem."
 
 
 24
 Id. (emphasis supplied).
 
 
 25
 A review of the administrative record in this case indicates that there is considerable evidence to underscore Dr. Arendall's conclusions. Initially, the Secretary's reliance on the statement by the claimant that her seizures are "lighter than they used to be" is taken out of context. The claimant was not indicating that her seizures were lighter than they were immediately after her surgery, but was comparing the seizures she is having now to those she suffered prior to the removal of the brain tumor in 1957. Claimant testified that she has five or six seizures a day. When she feels one coming on, she goes off to herself, sits down and tries to relax until it is over. When she speaks during one of the seizures, "it sounds like I am in a barrel. You know how it is when you hear someone talking and your head is stopped up with a cold, the voices sound a whole lot that way." J.A. at 66. She testified in some detail about one specific seizure that occurred. While she was driving, she testified that "everything, the whole ground and everything turned to blue, just a light blue." J.A. at 67. Claimant also testified that the more stress she is exposed to, the greater the frequency of the seizures. Dr. Arendall's statement that claimant's condition will get worse is supported by the claimant's son's testimony at the hearing that her seizures seem to be occurring more often now than before. See Smith v. Bowen, 849 F.2d 1222, 1226 (9th Cir.1988) (lay testimony used to establish seizure severity and frequency required by section 11.03); Braswell, 733 F.2d at 533 (same).
 
 
 26
 We hold that the Secretary also erred in concluding that the seizures documented above do not constitute a significant interference with activity during the day. The mere occurrence of five or six of the seizures as described above constitutes significant interference with one's daily activities. The Secretary argues that when the seizures pass, she can continue with her daily activities. However, that contention ignores the fact that the seizures occur. The seizures prevent claimant from driving a car, being near moving machinery or unprotected heights, or being in any situation where she is responsible for the health and safety of another person. In our view, such limitations, when combined with the occurrence of the seizures, constitute a significant interference with her daily activities.
 
 
 27
 The Secretary also failed to consider the significant lay testimony concerning the effect that the claimant's seizures have on her daily activity. Her son and sister testified that she is unable to do housework for more than fifteen to twenty minutes at a time and cannot be trusted to cook a meal or complete simple household tasks. Claimant's son testified that her level of energy has dropped, and claimant's sister stated that claimant is unable to take care of her mother anymore because she cannot be relied upon to give her mother the necessary medications at the proper time or in the proper dosage. Their testimony supports Dr. Arendall's statements regarding her automative behavior and akinetic mutism side effects from her surgeries.
 
 III.
 
 28
 In view of the uncontroverted medical opinion of claimant's treating physician as well as lay testimony in the record, we hold that claimant has established that she is suffering from a listed impairment. Since a conclusion that the claimant meets or equals a listed impairment requires a finding of disability, 20 C.F.R. Sec. 416.920(d) (1988), the judgment of the district court is REVERSED and this action REMANDED for an award of benefits.
 
 
 
 *
 Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation