Patti J. SELK, Plaintiff,

v.

Jo Anne B. BARNHART[1],
Commissioner of Social
Security, Defendant.

No. 4:01–CV–90621.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 24, 2002.

1. Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Timothy N. Tripp, Pella, IA, for Plaintiff.

Inga Bumbary–Langston, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Patti J. Selk, filed a Complaint in this Court on October 23, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed an application for Social Security Disability Benefits on April 7, 1999, claiming to be disabled since June 1, 1997. Tr. at 93–95. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on September 20, 2000. Tr. at 32–80. The ALJ issued a Notice Of Decision—Unfavorable on March 8, 2001. Tr. at 12–24. After the decision was affirmed by the Appeals Council on August 24, 2001, (Tr. at 5–6), Plaintiff filed a Complaint in this Court on October 23, 2001.

## MEDICAL EVIDENCE

On April 18, 1997, Plaintiff went to the emergency room complaining of an injury to her left knee. Plaintiff had felt something pop in the knee while kneeling after which she had pain with walking. A knee immobilizer was applied and she was discharged in ambulatory and stable condition. Tr. at 182.

On the evening of June 1, 1997, Plaintiff was a passenger in a car that was struck head-on. Plaintiff was taken to Marengo Memorial Hospital. Tr. at 156–66. X-rays showed a probable compression fracture in the cervical spine at C–7, and a normal lumbar spine. Tr. at 164. The x-rays showed a fractured sternum. The fracture was "incomplete, not penetrating to both cortices of the sternum." There was no evidence of fracture on the pelvis. Tr. at 165.

Plaintiff was transferred to St. Luke's Hospital in Cedar Rapids, Iowa on June 2, 1997. Plaintiff denied any loss of consciousness at the time of the accident. Her main complaint was severe sternal pain. Wilson W. Strong, Jr., M.D. made a diagnosis of blunt chest trauma with sternal fracture, rule out cardiac contusion. Tr. at 168. A chest x-ray showed the heart size to be within normal limits. The sternal fracture was not well visualized. Tr. at 171. Laboratory reports indicate that Plaintiff was discharged on June 3, 1997. Tr. at 172.

Plaintiff had an MRI of the cervical spine on July 16, 1997 because she was having left arm pain and numbness. There was no evidence of herniated disc seen on the study. Tr. at 180. Plaintiff underwent a total nuclear bone scan on November 26, 1997. The study was normal. Tr. at 179. An upper GI series and esophagram taken on December 1, 1997, showed a small self reducing hiatal hernia with reflux displayed. Tr. 178. Plaintiff was seen 18 times for physical therapy between December 3, 1997 and December 14, 1998. Tr. at 185–202. Despite the therapy, Plaintiff continued to have pain and tenderness throughout the sternum, chest and posterior thoracic cage. Tr. at 185. Plaintiff was seen for physical thera-

py nine more times between January 11 and October 14, 1999. Tr. at 216–26. Again, observations of tenderness were noted.

In a report dated January 20, 1999, addressed to James B. Paulson, M.D., Jeffrey S. Krivit, M.D. wrote that when he saw Plaintiff the chief complaint was of fluctuating right sided neck mass. Plaintiff also complained of headaches and ear popping. On physical exam, the doctor noted TMJ clicking. Dr. Krivit recommended an CT scan because of the fluctuating neck mass. Tr. at 203. A CT scan dated January 27, 1999, showed no gross abnormalities. No soft tissue masses were identified, there were no vascular anomalies and no intraglandular abnormalities were identified. Tr. at 215.

On August 5, 1999, Plaintiff saw Justin L. Ban, M.D. for a disability physical examination and evaluation. Tr. at 204–210. Plaintiff reported that subsequent to the car accident, she had persistent pain across the center of her chest, worse with deep inspiration, cough or sneezing. She said that she only obtained partial relief from the course of physical therapy. Plaintiff said that she is most comfortable when lying down, and she said that pressure of a bra frequently causes pain. She rated the pain as 7 on a 0 to 10 scale. She said that the pain was aggravated by activity and use of the upper extremities. Tr. at 204. Plaintiff said that she had difficulty sitting and standing more than 15 minutes and that she is unable to walk "more than several blocks." She said that she cannot lift more than a light bag of groceries. While Plaintiff said that she is independent with respect to activities of daily living, she said that pushing or pulling of a broom, mop or vacuum for more than 10 or 15 minutes was not possible due to pain. Plaintiff said that she cannot drive more than 10 or 15 minutes. Plaintiff was last employed as a cosmetologist, but was unable to work more than three or four hours per day. Tr. at 205. It was Dr. Ban's opinion that Plaintiff over-reacted to his examination. The doctor wrote:

Waddell's signs or non-physiological findings were specifically tested for and found to be positive. Light pressure on the skull did cause complaints of increased thoracic pain. Rotation of the trunk as a unit also resulted in complaints of increased pain. Straight leg raising supine measurements were consistent with straight let raising sitting. Superficial touch over the sternum resulted in pain. Over-reaction occurred during the examination which was in the form of facial expression and muscle tension.

Tr. at 206. Dr. Ban's diagnoses were: Status post fracture of sternum, and symptom magnification with multiple positive Waddell's signs. Tr. at 207. Dr. Ban opined that Plaintiff is able to lift and carry 50 pounds occasionally and 25 pounds frequently. He opined that Plaintiff is able to stand, move about, walk and sit normally in an eight hour day. The doctor said that Plaintiff has no limitations with respect to stooping, climbing, kneeling or crawling. He said Plaintiff is able to handle objects normally, see, hear, speak and travel normally. The doctor said that Plaintiff is tolerant to work environments including dust, fumes, temperature, hazards, etc. Tr. at 208.

On April 8, 1999, Dr. Paulson wrote a letter in support of Plaintiff's disability claim. In this letter he opined that Plaintiff is unable to perform her usual and customary work as a hair dresser. He wrote: "In terms of disability, basing this percent of disability on the amount of work that you have done in the last year in your normal profession, you are approaching nearly 100% disabled for that type of

work." Tr. at 230. Dr. Paulson's treatment notes are in the record and show that he treated Plaintiff for "significant pain." Tr. at 227–29.

On March 2, 2000, M. Fitz–Randolph, D.O., wrote a To Whom It May Concern letter. In this letter, Dr. Fitz–Randolph states that Plaintiff had been treated "numerous times" for pain with manipulative treatments and trigger point injections. Although Plaintiff obtained relief from the treatments, the doctor said that the relief was temporary. The doctor wrote: "The nature of her work (using her upper body and arms extensively) contributes to her recurrences/flares/ reaggravations of the pain. She has not shown significant change in her underlying condition since the initial evaluation; we are treating her symptomatically at this time." Tr. at 251.

Plaintiff was first seen by Dr. Fitz–Randolph on November 10, 1999. Plaintiff said that the pain she experienced was like " 'wearing a seatbelt' for three months after the accident; i.e., there was persistent bruising of the site as well as pain." Although the intensity of the pain had subsided, the area involved increased to encompass her left upper chest and left arm. Plaintiff said that area is weak all the time with occasional positional numbness and/or tingling. Plaintiff said that standing or walking were limited to 40 minutes each, and that sitting for approximately an hour exacerbates her pain. Plaintiff said that sleeping was difficult because rolling onto her left arm causes pain enough to awaken her. Plaintiff told the doctor that when she was a teenager she had been involved in an automobile accident and had fractured/dislocated her left clavicle. During a pregnancy in 1990, Plaintiff had ruptured a lumbar disk. Tr. at 252. On physical examination, there was decreased external rotation of the left shoulder with extremely tight pectoralis muscle and multiple tender

points along its origin and insertion. There was a palpable spur on the left clavicle at the acromion. There was minimal decreased internal rotation of the right shoulder. The doctor noted tender points on the anterior chest especially the central third of the sternum, left greater than right. There were tender points on posterior rib heads, ribs 2–6, and along subcostal diaphragmatic insertion bilaterally. The doctor's diagnoses were: post-traumatic arthritis of the left sternoclavicular joint; post-traumatic chest pain; mild adhesive capsulitis left shoulder; and somatic dysfunction chest, ribs, upper extremities, and abdomen. Tr. at 253.

In a report dated September 19, 2000 (Tr. at 264–66), Dr. Fitz–Randolph explained that she is board certified in internal medicine and that she had seen Plaintiff sixteen times since November of 1999. The doctor wrote: "She has met criteria for fibromyalgia syndrome on several visits." The doctor stated that although Plaintiff can have periods of improvement, she also experiences periods of exacerbation where chest and shoulder pain can be nearly incapacitating. The doctor said that Plaintiff's condition would involve "frequent manual treatment, including physical therapy, 3–5 days off work per month for therapy visits alone, continued change of medication as efficacy wanes and/or side effects become problematic, etc." The doctor wrote: "She describes her pain as chronically tender, heavy and aching, with frequent sharp, shooting or stabbing pain; overall the pain is 'exhausting.' " Tr. at 265. The doctor concluded the report:

> In my opinion, Patricia Selk is not malingering or factitious in her symptoms and function. She has shown times of improvement where her pain is controlled and her arm movement is less compromised; however, sustained use of

her arms in her current profession (hairdressing) is enough to cause frequent exacerbations of her pain, as would any chronic repetitive upper body motion. Although she has had self-identified depression in the past, she has not shown clinical evidence of depression or psychological conditions affecting her physical condition in the last 6–8 months that I have been working with her. Her physical impairments are consistent with her trauma history and physical findings.

In a work environment, I anticipate the patient could walk for 15–20 minutes before pain occurs (due to arm hang), sit for 30–45 minutes, stand for 15–20 minutes; continuous ability to change position would be needed. No repetitive hand or arm motion should be done due to the injury and chronic repetitive stress already occurring. Infrequent lifting of 15 pounds, rare lifting of 25 pounds can be accomplished, but without raising such a weight above chest height, and certainly not repeating the motion with any regularity. Fine manipulation by fingers is unimpaired, but pulling, pushing twisting or reaching overhead could all exacerbate the pain if performed repetitively. In my opinion, this patient continues to worsen her physical condition and exacerbate her pain by attempting to work even a part-time schedule in her job. Any position, even a "low stress" job would require some degree of physical repetition involving the arms which can only worsen this patient's current pain and disability. Tr. at 266.

## ADMINISTRATIVE HEARING

Plaintiff appeared at a hearing on September 20, 2000. Plaintiff said that she graduated from high school and had an additional year of training to get a cosmetology license. She said that she works two to three hours a day, three days a week in a beauty shop in the back of her home. Tr. at 36. Plaintiff said that she maintained that schedule since February of 1998. Before that, from June 1997 until February 1998, she did not work at all. Before the accident, Plaintiff said that she worked four days a week for 8 to 10 hours per day. Tr. at 37.

When asked to describe her disability, Plaintiff said that she has pain in her chest, neck, shoulders, and breasts. She described the pain as burning and tingling and "at times it's like knife stabbing pain." When she described the stabbing pain she pointed to her sternum and breasts and down her left arm. She said that she has pain all the time, but about three times a day she has sharp pain. Tr. at 40.

Plaintiff said that if she lifts a gallon of milk, she must cradle it with both arms. Tr. at 41. She said that when she goes to the grocery store by herself, she often must ask for help to put things into the cart. When she gets home, she often has to lay down and put heat packs on her chest to relieve the pain. Tr. at 42.

Plaintiff said that after the accident in June of 1997, she made some improvement until February of 1998 after which time her condition has stayed the same. Tr. at 42.

Plaintiff said that she began to see Dr. Fitz–Randolph at the suggestion of Dr. Paulson after the physical therapy treatment was completed.

When asked about her ability to sleep through a night, Plaintiff said that she had not had a good night's sleep since the accident. With new medication prescribed by Dr. Fitz–Randolph, however, Plaintiff said that she only wakes up once or twice each night. Tr. at 45. Plaintiff said that she can take three to five doses of pain medication each day and that on days

when the pain is bad and she must take more medication, the side effect is fatigue. Tr. at 46.

Plaintiff was asked to describe the examination by Dr. Ban. She said that most of the 45 minutes she was in his office, she was filling out papers for the nurse. "I saw Dr. Ban approximately 10 to 15 minutes of the 45 minutes I was there." Tr. at 46.

In addition to being a cosmetologist, Plaintiff's past work also included working as a library assistant in an elementary school, and as a teacher assistant. She said these jobs required her to lift a lot of books and to do a lot of stooping to put the books away. Tr. at 48. Plaintiff said that after her accident she lost approximately 80 percent of her beauty shop clients. Tr. at 50.

Plaintiff said that when she gets up in the morning, after getting her children off to school, she lays back down with a heating pad. Tr. at 51. This can last for two hours. She said she needs to do the same thing in the afternoon. Plaintiff said that often times the pain interferes with her ability to concentrate. Tr. at 53. Plaintiff said that driving causes her arm to tingle and become numb. Tr. at 54.

After Plaintiff had testified, the ALJ called Steven Moats, to testify as a vocational expert. Tr. at 67. The ALJ asked the following hypothetical question:

> We have a 38–year–old with a high school education, and work activities as set out in 14E (Tr. at 155). It is defined that exertionally she is occasionally limited to lifting 20 pounds, 10 pounds frequently. Standing, walking, or sitting with normal breaks in an eight hour day no problem. Occasional climbing, balancing, stooping, kneeling, crouching, or crawling based on (INAUDIBEL). She is to avoid constant overhead reaching, but otherwise no manipulative limitations, no communicative or environmental limitations. With those restrictions would she be able to perform any of her past work activities.

Tr. at 67–68. In response, the vocational expert testified that Plaintiff would be able to return to all of her past relevant work. The ALJ asked the vocational expert if Plaintiff were limited to sedentary work which allowed the ability to alternate between sitting and standing every hour, if she would have transferable skills. The vocational expert testified that she would not. He said, however, that there would be unskilled jobs such as surveillance system monitor, microfilm document preparer. Tr. at 68. Another unskilled job would be eyeglass assembler. The vocational expert said that if Plaintiff would not have the ability to use her upper extremities on a constant basis, surveillance system monitor would be the only job to which he could point. Tr. at 69. If Plaintiff were limited to light unskilled work with no repetitive use of the upper extremities, the vocational expert said that the job of parking lot attendant would also be available. Tr. at 70. When the vocational expert was asked about absence from work as noted by Dr. Fitz–Randolph, he said that no work would be possible. Tr. at 72.

## ALJ'S DECISION

In her decision dated March 8, 2001, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 1997, and that Plaintiff met the insured status requirement of the Social Security Act until March 31, 1999. The ALJ found that Plaintiff's severe impairments are chronic pain syndrome as a result of the injury sustained in a motor vehicle accident. The ALJ found that this impairment does not meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that

Plaintiff is able to do her work as a hair stylist, teacher's aide and library aide. Tr. at 23. In addition, the ALJ found that Plaintiff is able to do the unskilled work identified by the vocational expert at the hearing. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 24. The ALJ found that Plaintiff retains the residual functional capacity to lift 10 pounds frequently and 20 pounds maximum. The ALJ found that Plaintiff can stoop and climb occasionally, that she must avoid constant overhead reaching, that she can sit, stand and walk, and that she has no limitations on manipulating objects. Tr. at 23.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

The issue in this case is whether the finding that Plaintiff has the residual functional capacity to engage in her past work or any other work is supported by substantial evidence on the record as a whole. While it is the ALJ's function to assess the residual functional capacity based on all the evidence in the record, that finding must be supported by some medical evidence. *Lauer v. Apfel,* 245 F.3d 700, 705 (8th Cir.2001). In the case at bar, the only medical evidence in the record which supports the ALJ's finding is the opinion of Dr. Ban. Time and time again, however, the Court of Appeals for the Eighth Circuit has held that the opinion of a physician who examines a claimant once or not at all, is not substantial evidence of an ability to work. This is especially true where, as in this case, the opinion of the consulting physician is contradicted by the opinion of the treating physician. *Lauer,* at 705.

In *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000), the Court wrote that 20 C.F.R. § 404.1527(d)(2) requires that the ALJ give good reasons if the opinion of a treating physician is going to be rejected. In the case at bar, the ALJ rejected Dr. Fitz–Randolph's opinion because it was rendered outside the time that Plaintiff was last insured for benefits, and because it was based primarily on the basis of Plaintiff's subjective complaints. *See* Tr. at 20. In the opinion of the Court, neither of these reasons are sufficient to reject the opinion of the treating physician in this case. Subsequent medical, psychological, and psychiatric evaluations are relevant to

the extent they reflect upon the claimant's condition as of the date last insured, and they must be considered as part of a proper evaluation. *Fowler v. Bowen,* 866 F.2d 249, 252 (8th Cir.1989). In *List v. Apfel,* 169 F.3d 1148, 1149 (8th Cir.1999), the Court wrote: "Retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to the expiration of the insured period." Also, evidence outside the relevant time period cannot serve as the only support for the disability claim. "Such a holding would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed." *Pyland v. Apfel,* 149 F.3d 873, 878 (8th Cir.1998).

In the case at bar, while Dr. Fitz–Randolph did not begin treating Plaintiff until November of 1999, her treatment is a continuation of treatment begun by Dr. Paulson who treated Plaintiff since the date of her accident in June of 1997. Dr. Fitz–Randolph did not diagnose a previously unknown injury. Dr. Fitz–Randolph's diagnoses are corroborated by the notes of the physical therapist, nearly all of which under the heading "objective," observe that Plaintiff was tender along the sternum and/or the rib cage.

In *Pyland,* the claimant alleged disability beginning in September of 1979, with a date last insured (DLI) of September 30, 1981, and an application filed August 31, 1992. In order to prevail, the evidence needed to show that Pyland's current impairment existed before she was last insured and that it was severe enough to be disabling. The only evidence that Pyland may have qualified for benefits was a consultative psychiatric evaluation performed six months after the DLI had passed. That evaluation did not provide the information necessary to show that Pyland suffered from an impairment sufficiently severe to prove disability. In *Fowler,* on the other hand, Fowler applied for benefits in 1983 and his DLI passed March 31, 1984. The Court of Appeals held that it was error for the ALJ to reject an opinion of a treating physician that Fowler was disabled during the time he was insured because the doctor's opinion was consistent with treatment records from the University of Iowa where he had been treated for conditions relating to his heart and lungs.

The case at bar is more akin to *Fowler* than to *Pyland.* Plaintiff was injured in a motor vehicle accident in which she fractured her sternum. Although the fracture healed, Plaintiff consistently sought treatment for pain from her family doctor and from a physical therapist. Plaintiff was also treated with various medications including anti-depressants to help her sleep. Dr. Fitz–Randolph, a board certified internal medicine pain specialist, diagnosed post-traumatic arthritis of the left sternoclavicular joint causing musculoskeletal chest pain and adhesive capsulitis of her shoulder. In addition, the doctor stated that Plaintiff met the criteria for fibromyalgia. Although the doctor related Plaintiff's symptoms, ("A patient's report of complaints, or history, is an essential diagnostic tool." *Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir.1997)), she also pointed to the objective signs upon which she based her diagnosis. As pointed out above, the observations of the objective signs are found in the contemporaneous treatment notes of the physical therapist. Thus, Dr. Fitz–Randolph is a treating physician, a specialist, and her observations are not the only evidence of Plaintiff's impairments during the insured period. It was error for the ALJ to have rejected her report.

■ Testimony from a vocational expert is substantial evidence only when it is based on a properly phrased hypothetical

question that captures the concrete consequences of the claimant's impairments. *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir.1997). In this case, the only substantial evidence which supports the testimony of the vocational expert upon which the ALJ relied to deny benefits is the report of Dr. Ban. Dr. Ban's report, however, does not qualify as substantial evidence for the reasons stated above. When the vocational expert was presented with a hypothetical based on Dr. Fitz–Randolph's report, it was his testimony that neither Plaintiff's past relevant work nor any other work could be performed.

■ In *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote: "Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." Likewise, in *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir.2001), the Court, discussing whether a reviewing court should remand with instructions or award benefits, wrote:

> [I]f the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. *See Mowery v. Heckler*, 771 F.2d 966, 973 (6th cir.1985). Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order payment or affirm denial. Conversely, if an essen-

tial factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings.

In the case at bar, although the ALJ stopped the sequential evaluation at the fourth step, finding that Plaintiff is able to do her past relevant work, hypothetical questions were put to a vocational expert which considered Plaintiff's ability to do work at both the fourth and fifth steps of the sequential evaluation. When the restrictions set forth by Dr. Fitz–Randolph were put into the form of a hypothetical, the vocational expert testified that no work is possible. As the Court stated in *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir. 1980), quoting *Thomas v. Celebrezze*, 331 F.2d 541, 546 (4th Cir.1964) wrote: "Employers are concerned with substantial capacity, psychological stability, and steady attendance.... It is unrealistic to think that they would hire anyone with the impairments of this claimant." *See also, Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir.2001) citing *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir.1984).

To borrow language from Judge Lynch in the passage quoted above from *Seavey*, there is no "essential factual issue" which needs to be resolved by a remand to the Commissioner. Therefore, the Commissioner is hereby ordered to award Plaintiff the benefits to which she is entitled. *See also Taylor v. Chater*, 118 F.3d at 1279 (remand not necessary where the record overwhelmingly supports a finding of disability); *Holmstrom v. Massanari*, 270 F.3d at 722 (remand for further proceedings except for award of benefits unnecessary where disability is established).

## CONCLUSION AND DECISION

The Court holds that Commissioner's decision is not supported by substantial evidence on the record as a whole. The

Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark. 987). The medical and vocational evidence establish that Plaintiff does not have the residual functional capacity to work either at her past relevant work as the ALJ found, or any other work in the national economy. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. Therefore, reversal with an award of benefits is the appropriate remedy. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

This cause is remanded to the Commissioner for computation and payment of benefits base on her application for Title II benefits. The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.