**Peggy L. GROAT, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 1:02–CV–90041.**

United States District Court, S.D. Iowa, Western Division.

Sept. 22, 2003.

Dennis P. Marks, Omaha, NE, for Plaintiff.

Inga Bumbary–Langston, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Peggy L. Groat, filed a Complaint in this Court on September 17, 2002, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability benefits and Supplemental Security Income benefits on August 11, 1999. Tr. at 60–62 & 208–09. Plaintiff claimed to have become disabled July 23, 1999. Tr. at 60. Plaintiff is insured for Title II benefits through December of 2004. Tr. at 69. After the applications were denied initially and on reconsideration, Plaintiff requested a hearing which was held before Administrative Law Judge Jan E. Dutton (ALJ) on October 19, 2000. Tr. at 272–322. The ALJ issued a Notice Of Decision—Unfavorable on January 24, 2001. Tr. at 15–25. After the decision was affirmed by the Appeals Council on July 26, 2002, (Tr. at 6–8); Plaintiff filed a Complaint in this Court on September 17, 2002. On January 15, 2003, the Commissioner moved for a remand because it was not possible to prepare a record which is required for judicial review. The motion was granted. On June 17, 2003, the Commissioner informed the Court that a record had been located and moved for the case to be reopened. Because Plaintiff resisted the motion to reopen, a hearing was held July 3, 2003, after which the motion was granted and a briefing schedule issued. The case is now fully submitted.

As will be shown below, a detailed summary of the medical evidence is unnecessary for a proper understanding of the issues in this case. Nevertheless, the Court has read each page of this record, and a summary of the medical evidence is attached as an appendix at the end of this opinion.

Plaintiff appeared and testified at a hearing before the ALJ on October 19, 2000. Tr. at 272–322. Plaintiff testified that she was 50 years old and that her date of birth was March 8, 1950. She said that she graduated from high school. Tr. at 278. Plaintiff said that the job she held for the longest time was as a secretary at a hospital. Tr. at 281. She had also worked for a month, on two occasions, selling glass items at a kiosk in a mall. Tr. at 283. The last job Plaintiff held was as a manager of an apartment complex. Tr. at 284. Plaintiff said that she gave up that job because she was unable to climb stairs to show the apartments and because she was unable to do the writing and paper work. Tr. at 285. Plaintiff testified that she takes Roxicet, Ibuprofen, and Naproxen for pain. She said that Roxicet is a narcotic medication and that Dr. Keller had recently instructed her to take it twice a day. Tr. at 291–92. She said that her daily activities are mostly watching TV. Tr. at 293.

After Plaintiff and her husband testified, the ALJ called Sandra Trudeau to testify as a vocational expert. Tr. at 309. The vocational expert submitted a written summary of Plaintiff's past relevant work (Tr. at 132) which was slightly modified after Plaintiff's testimony. Tr. at 310. On the Vocational Report the job of apartment manager was identified with the Dictionary of Occupational Titles (DOT) code of 186.167–018. The Report states that the DOT lists this as a sedentary job and that

Plaintiff did it as a light job. Tr. at 132. The ALJ asked the following hypothetical:

> ... From a functional capacity, standpoint of she should only be on her feet two hours out of an eight-hour day, standing or walking. If she could sit for six hours out of an eight-hour day. If she could do postural activities on an occasional basis. And by this I mean, climbing, crawling, stooping, kneeling, crouching. And environmentally she should avoid working in environments where there's extreme heat or extreme cold. And as it involves her hands, that she should not use her hands on a constant basis, but could use her hands on a frequent basis. With that functional capacity, could she return to any of her past work.

In response, the vocational expert testified that Plaintiff would be able to do her past work as an assistant apartment manager, and as a sales person—a job that was later eliminated. Tr. at 312. The vocational expert testified that because of the limitations on standing and walking, the ALJ's hypothetical question allowed for no more than sedentary work. She said that Plaintiff's past work as a secretary could not be done because of the ALJ's restriction on the use of the hands. Tr. at 314. As noted above, the vocational expert eliminated the sales job because it is a light job whereas the ALJ's hypothetical only allowed for sedentary work. Therefore, the only one of Plaintiff's past jobs that could be done, according to the vocational expert, was that of the apartment house manager. Tr. at 315.

The vocational expert did not identify any sedentary jobs to which Plaintiff has transferable skills. Tr. at 315. The vocational expert said there are unskilled sedentary jobs which would fit the hypothetical situation. Tr. at 316.

In the decision dated January 24, 2001, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after the alleged onset of disability date. At the second and third steps, she found that Plaintiff has severe impairments none of which meet or equal any listed in Appendix I, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is able to perform her past relevant work as assistant manager of apartments, as generally performed in the national economy (Tr. at 23). The ALJ found that Plaintiff has the residual functional capacity to work consistent with her hypothetical, except that the finding added a lifting limitation of 20 pounds occasionally and 10 pounds frequently. The ALJ also found that Plaintiff was able to do the unskilled sedentary jobs identified by the vocational expert. Tr. at 24. It was the ALJ's decision that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 25.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent po-

sitions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

In her brief, Plaintiff makes three arguments: 1) That the ALJ erred by improperly assessing residual functional capacity; 2) That the ALJ must, and did not, examine the factors listed in the *Polaski* case when reviewing subjective allegations of pain to determine whether the Claimant's testimony is credible; and, 3) that the Commissioner erred by discounting the reports of a treating physician. Although these "text book"—for lack of a better term—arguments may be applicable in other cases, they have no applicability to the case at bar. As stated above, however, the Court has a duty to *carefully* analyze the entire record. The Court will now proceed with a recitation of its analysis and decision.

■ In *Jones v. Chater,* 86 F.3d 823, 826 (8th Cir.1996), the Court wrote that a claimant must show the inability to do past relevant work both as the work was done by the claimant, and as the work is generally required by employers throughout the national economy, i.e. as the job is described in the DOT. In the case before the Court, the ALJ found that Plaintiff is able to do her past work as an apartment house manager as it is described in the DOT. The vocational expert identified this job with the DOT number of 186.167–018. The vocational expert wrote Plaintiff did this work at the light level of exertion, but that the DOT classifies it as a sedentary job.

Tr. at 132. When the Court consulted the DOT, however, it was found that the DOT clearly states that this job requires the ability to do light work activity. "Physical demand requirements are in excess of those for sedentary work." It should be remembered, too, that Plaintiff testified that she had to quit this job because she could no longer do the walking, particularly up and down stairs, that the job required. In other words, there is no difference between the way Plaintiff did her past work and the way it is defined in the DOT. The Eighth Circuit Court of Appeals has held that when there is a conflict between the testimony of a vocational expert and the DOT, the DOT controls. *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir.1997). Such is the situation in the case at bar.

The vocational expert's testimony was very clear that the ALJ's hypothetical question did not allow for standing and walking long enough to accommodate light work. *See* 20 C.F.R. § 404.1567(a) & (b) (even though the weight lifted may be only a negligible amount, a job is rated as light when it requires a significant degree of walking or standing, or when it involves sitting most of the time but entails pushing and/or pulling of arm or leg controls). When it became clear to the vocational expert that the ALJ was limiting Plaintiff to standing and walking for two hours a day, the vocational expert eliminated Plaintiff's past work as a sales person at the glass kiosk as well as any jobs to which Plaintiff's skills might transfer. In her findings, the ALJ, relying on the mistaken testimony of the vocational expert, found that Plaintiff could do either her past work as an apartment manager, or the unskilled sedentary jobs cited by the vocational expert. The vocational expert is clearly wrong, however, that apartment managers work at the sedentary level according to the DOT. The vocational expert's testimo-

ny on that point is not substantial evidence.

Because the job of apartment manager requires the ability to do light work, both as the DOT describes it and as Plaintiff did it, and because the ALJ's standing and walking limitations do not allow for more than sedentary jobs, Plaintiff has met her burden of showing that she is unable to return to any of her past relevant work.

In *Hensley v. Barnhart*, 334 F.3d 768, 769 (8th Cir.2003), the Court wrote that where a claimant's impairments prevent performance of past relevant work, "the claim must be considered in light of several vocational factors (age, education, and work experience) and the individual's residual functional capacity. 20 C.F.R. § 404.1520(f). The result of this two-pronged inquiry determines whether the individual is disabled or can still engage in 'substantial gainful activity.' "

In the opinion of the Court, the ALJ's finding that Plaintiff is unable to do more than sedentary work is supported by substantial medical evidence. The second prong of the burden is to show that there is a substantial number of jobs in the national economy which the claimant can perform. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc). The Commissioner may meet this burden in one of two ways—the medical vocational guidelines or vocational expert testimony. Where, as in the case at bar, a claimant has a combination of exertional and nonexertional impairments, the guidelines are first consulted to determine if a finding of disabled is appropriate. If such a finding is not directed, the ALJ must then consider how much the individual's work capability is further diminished by the nonexertional impairments. *Id.* at 1148; *see also, Pettijohn v. Heckler*, 759 F.2d 669, 670 (8th Cir.1985) (reliance on the guidelines is not proper where the claimant has nonex-

ertional impairments and the guidelines do not direct a finding of disabled).

In the case at bar, the vocational expert testified that the ALJ's findings regarding residual functional capacity limited Plaintiff to sedentary work. Other than the vocational expert's mistake concerning the exertional demands of Plaintiff's past work in the DOT, the only work possible was unskilled and sedentary. Rule 201.14 of the guidelines provides that a person who is unable to do past work, who is limited to sedentary work, who is closely approaching advanced age, who has a high school education but who has no transferable skills, is entitled to a finding of disabled.

In *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote:

Ordinarily, where the Secretary has incorrectly allocated the burden of proof based on an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

Here, the record is fully developed. Substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff is unable to stand and walk longer than 2 hours per day and is limited to sedentary work. The vocational expert has already testified that any skills Plaintiff acquired in her past work will not transfer to sedentary jobs. At the time of the hearing, Plaintiff was 50 years old. Her date of birth is March 8, 1950. Tr. at 60. At the time of the onset of disability, Plaintiff was 49 years old. Because of the statutory waiting period, the first month Plaintiff is entitled to receive benefits is January of 2000, at which time she would

have been about three months shy of her 50th birthday. Tr. at 74. In *McCoy v. Schweiker*, 683 F.2d at 1148, the Court noted that the regulations state that the age categories will not be applied mechanically in a borderline situation. The Commissioner's regulations, therefore, permit only one decision, i.e., Plaintiff is disabled and entitled to the benefits for which she applied. A remand to take additional evidence would serve no useful purpose. The case is reversed. The Commissioner is ordered to award Plaintiff the benefits for which she applied.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's final decision to deny benefits is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's final decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark. 1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled. The case is remanded for the sole purpose of calculating and awarding Plaintiff's benefits. The Clerk shall enter judgment accordingly.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.

## APPENDIX

### REVIEW OF MEDICAL RECORDS

Plaintiff received medical care at Alegent Health Clinic in Council Bluffs, Iowa. Although the doctors are identified only by initials in most of the treatment records, it appears as though Plaintiff often saw David M. Keller, M.D. Tr. at 151–62. On September 4, 1998, it was reported that an EMG and nerve conduction study had been normal. An MRI showed isolated cervical spondylolisthesis, midline C5–6 with slight deformity at the cervical cord level. Tr. at 162.

On September 18, 1998, Plaintiff saw Huy D. Trinh, M.D. of Miller Orthopaedic Affiliates in Council Bluffs, on referral from Dr. Keller. Dr. Trinh wrote that he was seeing Plaintiff for a progressive right upper extremity pain that started from the top of her right shoulder going down to her right arm, forearm and hand with diffuse numbness of the right hand. Plaintiff also complained of neck pain. This had been going on for the previous year. Plaintiff had positive tests on physical examination which produced pain shooting along her right shoulder. The doctor also noted tenderness around the shoulder, elbow and wrist. Dr. Trinh diagnosed discarthosis at C5–C6, and right cervical radiculopathy. He said that he would like Plaintiff to receive a home cervical traction device and to have a cervical epidural injection. Under the heading Work Status, the doctor wrote that Plaintiff could continue her current level of work. Tr. at 172. On October 1, 1998, Plaintiff reported that the cervical traction device helped temporarily but that she started getting headaches after using it. She said that the epidural injection had not helped. She was still complaining of the pain. Dr. Trinh recommended a Myelo CT scan of the C-spine to see if it would confirm nerve root compression. Tr. at 171. On October 12, 1998, Dr. Trinh wrote that the Myelo CT scan had not shown any neuroal compression so no surgery was indicated. The doctor recommended a subacromial injection to the right shoulder to find out if it

would give some relief. He said that if relief was obtained, than an MRI of the right shoulder would be indicated. Tr. at 170.

On October 19, 1998, Plaintiff complained to doctor Keller of continue neck pain. Dr. Keller wrote that Plaintiff had been to two spine specialists who had not determined that the neck was the cause of the pain, even though there were some arthritic degenerative changes. Plaintiff had pain that went all the way down to her hands. There was pain with extension of her wrists. Plaintiff also had pain in her right rotator cuff and right shoulder. In addition, Plaintiff had symptoms of fibromyalgia. Dr. Keller's diagnoses were: DeQuevarin's disease; rotator cuff tendinitis; fibromyalgia; and, probable neuropathy from cervical spine. Tr. at 161. Plaintiff was seen for Asthma on November 4, 1998. Tr. at 160. When Plaintiff was seen on May 17, 1999, she had tremendous musculoskeletal and fibromyalgia like pain working throughout her whole body. Plaintiff was also having trouble with her back, hip and right knee. Among the objective tests, the straight leg raise was positive on the left at 45 degrees but did not produce radiculopathy. Among the diagnoses were myofascial pain and fibromyalgia pain disorder. The doctor also diagnosed degenerative joint disease in Plaintiff's hip and knee with acute lumbar back spasm in the left lumbar spine. Tr. at 157. On July 29, 1999, Plaintiff was having a headache which had come on the previous Friday. The doctor gave Plaintiff Vicodin and Bactrim. The doctor advised Plaintiff to go to the emergency room if she did not improve or if she got worse. Tr. at 156.

Plaintiff was seen at Alegent Health Mercy Hospital, in Council Bluffs, Iowa on July 29, 1999. Plaintiff complained of a headache of one week's duration. Plaintiff was given an injection of Demerol and Vistaril which, after about an hour, began to provide some relief. A CT scan of the brain was normal. Under the heading "Past Medical History," Plaintiff said that she had been told that she had lupus, but a rheumatology report by a doctor Kinneck stated that she had fibromyalgia but not lupus. Plaintiff also had a history of cervical disc disease at C5–C6 for which she had epidural therapy. Plaintiff's medications included Bactrim and Vicodin which had been prescribed for the headaches, Flovent, Albuterol, Darvocet and Flexeril, Amitriptyline, Tylenol with codeine, and Tiazac. When Plaintiff was taken to the hospital floor, it was noted that she was feeling better and was able to eat most of her lunch. Tr. at 135. Plaintiff was admitted to the hospital for overnight observation. D.M. Keller, M.D. made the following diagnoses: Cephalgia, history of fibromyalgia, hypertension, asthma, obesity, questionable viral encephalitis. Tr. at 136. A CT scan of Plaintiff's cervical spine dated October 8, 1998, showed minimal osteophytic spurring without central or neural foraminal stenosis at C4–5. The scan also showed moderate central osteophyte but without frank central stenosis or cord deformity at C5–6. Tr. at 139.

Plaintiff saw Dr. Keller again on August 4, 1999. The headache had come back, and Plaintiff had noticed a rash on her arms, abdomen and chest. Tr. at 154. Plaintiff saw another doctor at the clinic on December 7, 1999 because of her left knee which had been swelling up for the previous two weeks. Plaintiff was taking Ibuprofen 800 mg and Vicoden but neither helped the knee pain. On examination, the doctor noted mild tenderness, crepitus and diffuse edema. X-rays did not show any injury to the knee and the doctor diagnosed arthritis. Tr. at 152.

Plaintiff underwent an MRI of her left knee on January 21, 2000. This study showed a small horizontal tear in the posterior horn of the medial meniscus communicating with the tibial articular surface. It also showed small joint effusion. The lateral meniscus, cruciate ligaments and collateral ligaments were normal as was the retinacula of the patella and there was no patellar deviation. Tr. at 206.

On January 25, 2000, Plaintiff saw David T. Grinbergs, D.O. for a consultative examination. Tr. at 182–88. Plaintiff told the doctor that she is able to sit for about 10 minutes, stand for 15–20 minutes, walk about a half block. She also said that she can lift up to 10 pounds and can occasionally bend and twist. Plaintiff told the doctor about the MRI which she had undergone the previous Friday. Tr. at 182. Plaintiff told doctor Grinbergs that she had not worked since July of 1999, as a leasing consultant. She said that she stopped working because of pain. She told the doctor that through most of her work life she had been a unit secretary in a critical care unit. Tr. at 183. After a review of systems, a physical examination and a review of medical records, Dr. Grinbergs' diagnoses were: Chronic cervical, dorsal, and lumbar spine pain, possibly secondary to degenerative changes; Numerous arthralgias and myalgias, more so in the left knee, possibly secondary to degenerative changes and exacerbated by obesity; history of fibromyalgia per old medical records; history of systemic lupus, although per my exam today and an old note, I do not see any evidence of this; chronic pain syndrome; probable symptom magnification. At the conclusion of his report, the doctor wrote:

This patient does exhibit chronic pain syndrome and I interpreted her pain perception is markedly enhanced and her pain behavior has become maladaptive and counterproductive. This disorder is characterized by both pain perception and pain behavior as being grossly disproportionate to any underlying noxious tissue abnormality. She also does exhibit some evidence of symptom magnification, but this diagnosis in to intended to discredit her complaint of pain. The diagnosis is not intended to suggest an intentional misrepresentation of pain and disability, but more likely represents a learned pattern of illness behavior. From a physical standpoint, she certainly does have possible degenerative changes in several areas which are exacerbated by her obesity. It is questionable today per my exam and old medical records if she truly does indeed have fibromyalgia. I do not see any evidence of lupus, and per old medical records, nor doe the rheumatologist.

With regards to her impairments, sitting up to four hours a day should not be a problem and standing up to a couple of hours at a time as long as she gets on and off her feet once in a while should not be a problem. Walking is limited to one block and she probably does need a cane in her current state until MRI results come back on her knee as to possible internal derangement. She has a 10–15 pound lifting restriction and only occasional bending and twisting. Essentially no climbing or crawling can be expected. No problems handling objects, hearing, speaking or traveling, and no mental impairments. She does need a cane currently for ambulation beyond within-the-house and for short distances.

Tr. at 186.

On February 22, 2000, Plaintiff underwent arthroscopy and partial medial men-

iscectomy of the left knee. Tr. at 204. In the pre-surgery history and physical (Tr. at 202–03), swelling was noted in all of Plaintiff's joints. Tr. at 202.

On July 6, 2000, Plaintiff saw Dr. Keller. She continued to have "tremendous trouble with body pain." She told the doctor that her legs had "started to feel bad. She could hardly walk out of the house." Plaintiff had taken a variety of medication which either did not help or sedated her. She reported the most relief with Percocet, but the Doctor noted the addictive potential of that medication. Due to orthopnea, Plaintiff was only able to sleep in a chair. Plaintiff had developed shortness of breath in the last couple of weeks. "If she gets up and tries to do anything, she just feels winded." Plaintiff also complained of a sore throat and cough. Tr. at 253. Dr. Keller's physical examination included an EKG which he said was consistent with an anterior septal myocardial infarction in the past. The doctor's diagnoses were: Asthma, systemic lupus erythematosus, near syncope, and dyspnea on exertion. The doctor wrote that he would obtain an echocardiogram of Plaintiff's heart, and a pulmonary function test since it had been several years since he had obtained one. He gave Plaintiff a prescription for Percocet and other medications. Tr. at 252.

Plaintiff underwent a pulmonary function study on July 18, 2000. This test produced markedly different results than were produced in a study two years before. Louis Violl, M.D. noted that Plaintiff became quite short of breath during the testing. The doctor wrote that the test results were "significant for a severe obstruction." The doctor recommended clinical correlation because "patient cooperation absolutely will affect results." Tr. at 201.

On July 26, 2000, Plaintiff saw Dr. Violi in his office. Tr. at 255–57. Plaintiff told the doctor that she had asthma since 1984, and had been having worsening shortness of breath with activity in the previous month. She said that the shortness of breath had caused her to retire from her job as an apartment complex manager. She said that she felt as though air sticks in her throat. Plaintiff reported "a great deal of difficulty with audible wheezing and with cough. She occasionally have paroxysms of coughing." The doctor noted that coughing had interfered with the pulmonary function study in July. Plaintiff's husband told the doctor that he had noticed a change in Plaintiff's voice over the previous month which he said was less forceful and "more breathlessness of her voice." Plaintiff said that talking causes worsening shortness of breath. Plaintiff said she had been told that she had a mild heart attack in the recent past. Plaintiff medications were: Flovent, Proventil, Ziac, Percocet, Naprosyn and an aspirin. Tr. at 255. The doctor noted that Plaintiff was a lifetime nonsmoker and that she did not drink or use drugs. On physical examination, Plaintiff's lungs were clear, but she was unable to take a deep breath without coughing. Tr. at 256. The doctor wrote that the pulmonary function study showed severe obstruction and that it could be caused by obesity or poor cooperation. The doctor also noted: "It is interesting that the expiratory flow volume loop shows scalloping which may be seen in patients with vocal cord dysfunction." He went on to opine that vocal cord dysfunction could be causing the chronic cough and that this could be related to silent reflux. He said that he would refer Plaintiff to Dr. Dudley Syre in Council Bluffs, a rhinolaryngologist. The doctor recommended a prescription of Prilosec and

speech therapy. Tr. at 257. A record of a phone message at Dr. Keller's office dated August 3, 2000, states that Plaintiff said that Dr. Syre had found nothing wrong with her vocal cords.

On August 21, 2000, Plaintiff went to the emergency room complaining of chest pain for the previous 3–4 days. Plaintiff had recently separated from her husband and had been under a lot of stress. It was noted that Plaintiff had undergone a stress test two weeks before, and was told it was "OK" On physical exam, Plaintiff did not appear to be in acute distress. Her heart had a regular rhythm and there was no apparent chest wall tenderness. Samuel Choy, M.D. made the diagnosis of left chest pain. The plan was to admit Plaintiff to the chest pain center. Tr. at 199. A CT scan of Plaintiff's chest on August 24, 2000, was normal. Tr. at 262. On August 29, 2000, Plaintiff underwent an exercise stress test under the direction of Dr. Violi. The test was stopped due to knee pain. The doctor wrote that Plaintiff's exercise tolerance was mildly reduced which he attributed to deconditioning. Tr. at 261.

Plaintiff saw Dr. Violi again on August 22, 2000. She was doing better than in July but still reported shortness of breath with activities such as vacuuming or bending at the waist to tie her shoes. Plaintiff did not notice any difference regarding heartburn with the Prilosec although the doctor noted that the cough had improved since introduction of that medication. The doctor wrote that some of Plaintiff's abnormal pulmonary function tests was "due to her inability to cooperate." Dr. Violi said that he thought that Plaintiff may also have a component of anxiety as well as obesity and deconditioning contributing to her poor test results. He wrote that he wanted to send Plaintiff for a cardiopulmonary stress test but said that Plaintiff was not able to ride a bicycle due to her lupus. Tr. at 254.

Dr. Keller's office note of August 24, 2000, states that Plaintiff was "still having trouble with her vocal cord asthma." He also stated that she was continuing to receive pulmonology workup. Dr. Keller stated that the ENT examination was negative. The doctor noted that Plaintiff's arthritis and lupus were giving her trouble. Dr. Keller noted that Plaintiff was going to have a bicycle stress test under the direction of Dr. Violi. Tr. at 250. On September 29, 2000, Dr. Keller's office note states that when Plaintiff attempted to perform the stress test, "she had so much pain on the bike they had to carry her to a car." The doctor wrote that the pain medication was not working and that Plaintiff was still having shortness of breath and chest pain. The doctor observed that Plaintiff was still using a cane and was walking slow. The doctor wrote that he wanted Plaintiff to continue to work with Dr. Violi. "We have got to figure her chest pain out and her shortness of breath." He wrote Plaintiff a prescription for Elavil. Tr. at 249.