Delores B. KINZEBACH, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 4:05 CV 195 RWP TJS.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 10, 2006.

Christopher D Hagen, U S Attorney's Office, Des Moines, IA, for Commissioner of Social Security unknown, Defendant.

Timothy N Tripp, Tripp, P.C., Pella, IA, for Delores B. Kinzebach, Plaintiff.

## ORDER

PRATT, District Judge.

Plaintiff, Delores B. Kinzebach, filed a Complaint in this Court on April 4, 2005, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Social Security Disability benefits on May 10, 2002, claiming to be disabled since April 2, 2002. Tr. at 44–46. Plaintiff, whose date

of birth is May 27, 1961 (Tr. at 44), was 43 years old at the time of the hearing. Tr. at 337. Plaintiff is last insured to receive disability benefits on December 31, 2006. Tr. at 55. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on June 22, 2004. Tr. at 334–63. The ALJ issued a Notice Of Decision—Unfavorable on October 26, 2004. Tr. at 11–18. After the decision was affirmed by the Appeals Council on February 4, 2005, (Tr. at 6–10), Plaintiff filed a Complaint in this Court on April 4, 2005.

Following the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. At the second step the ALJ found that Plaintiff's severe impairment is dysthymia[1]. The ALJ found that this impairment does not qualify for benefits at the third step of the sequential evaluation. At the fourth step, the ALJ found that Plaintiff has the residual functional capacity to work with no physical or mental limitation. The ALJ found that Plaintiff is able to do her past relevant work, including the job she left on April 2, 2001 because of her husband's illness (Tr. at 149). Because the ALJ stopped the sequential evaluation at the fourth step, she found that Plaintiff was not disabled and not entitled to the benefits for which she applied. Tr. at 18.

## MEDICAL EVIDENCE

On June 12, 2002, John Daniel, Ph.D., a licensed clinical psychologist at the Poweshiek County Mental Health Center, responded to a request for information from Disability Determination Services. Plain-

tiff had been seen at the Center since 1991, with current visits dating from 1998. Most recently, Plaintiff was being seen by psychiatrist Laura Van Cleve, D.O. In 1998, psychiatrist Kathryn Hall diagnosed bipolar disorder, hypomanic, and alcohol abuse and dependence in partial remission (*see* Tr. at 188–89). In addition, Plaintiff had been seen by two psychotherapists. In the previous three years, Plaintiff had two hospitalizations for treatment of alcoholism and recurrent symptoms of the bipolar disorder. Tr. at 186. At the time of the letter, Plaintiff was maintaining sobriety but experiencing "a good bit of anxiety and depression." Dr. Daniel wrote that Plaintiff was attending three AA meetings each week to maintain her sobriety. Plaintiff's medication was Zoloft 100 mg., and Seroquel 100 mg. Dr. Daniel wrote that Plaintiff left her job because she was unable to cope with the combination of stressors at home and at work. He said that if Plaintiff were granted benefits, she would need assistance in managing them because: "...having to deal with this responsibility would simply increase the stresses in her life and increase the likelihood of serious exacerbation of her Bipolar Affective Disorder symptoms and/or excessive drinking." Tr. at 187.

Plaintiff was hospitalized from August 19—23, 2001, at Iowa Lutheran Hospital because of her inability to stop drinking on her own. Upon discharge, she was transferred to the intensive outpatient dorm bed unit for additional treatment where she stayed until September 7, 2001. Tr. at 200–21.

Plaintiff was seen for an orthopedic examination by Kurt Vander Ploeg, M.D. on October 28, 2002. It does not appear that the doctor found any abnormalities. Tr. at

---

**1.** The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at

least two years. Diagnostic And Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TR) at page 376.

237–40. The doctor wrote: "About a year ago [she was] diagnosed with PTSD due to physical abuse by a brother when she was young." Tr. at 237.

Dr. Daniel wrote a report on October 27, 2003. He had last seen Plaintiff on October 9, 2003, when Plaintiff had come in "extremely distressed at that time, tearful and virtually sobbing some of the time during the session." The doctor pointed to "a number of very significant and extreme stressors that are effecting her at this time." Those stressors included: Her mother was ill; her chronically mentally ill brother had to be hospitalized and was making threats to burn down the mother's house; her 17 year old son was refusing to do his school work and was getting into trouble at school; her husband was chronically and seriously ill; her car had broken down; and, there was no money to pay for medical essentials. The doctor wrote: "All of these stressors strongly contribute to [Plaintiff] experiencing exacerbated PTSD symptoms, generalized anxiety, nightmares and flashbacks; depressive symptoms including problems with sleep, significantly depressed mood, irritability and difficulty controlling her temper." Tr. at 243. Dr. Daniel opined that the stressors Plaintiff was experiencing in October of 2003, were even greater than they were in the spring of 2002, when she had to give up her part time work. The doctor said that if Plaintiff tried to work, it was his opinion that she would increase the probability of more severe psychiatric symptoms including anxiety and depression, and there would be a "great likelihood of resuming excessive drinking." The doctor concluded: "I think her capacity for working full-time is even more limited than when I previously wrote to you on November 18, 2002." Tr. at 244.

The Court has read the treatment notes from the Mental Health Center (Tr. at 249–51 & 254–325). A complete summary of each entry would not add to this discussion. On November 5, 2002, Donna Sullivan, PA–C, psychiatric physician assistant at the Mental Health Clinic wrote to Disability Determination Services in support of Plaintiff's claim. Ms. Sullivan stated that both she and Dr. Van Cleve were both of the opinion that with a lower stress level, Plaintiff was able to maintain sobriety and cope with ongoing stressors. Tr. at 254. Ms. Sullivan's Axis I diagnosis was: "1. Evaluate for Dysthymia vs. BAD (Bipolar Affective Disorder). 2. History of alcohol dependence, in early remission. 3. Evaluate for PTSD." See, e.g. Tr. at 256, 258, 261, 263, 265, etc., etc. Ms. Sullivan pointed out that the Axis V diagnosis varied between 55 and 65, and that the diagnosis varied based on Plaintiff's level of anxiety. Tr. at 254. On the other hand, many of the treatment notes from the mental health center seem to suggest that the reason Plaintiff is unable to work is the stress she has due to her husband's illness and her daughter's situation being pregnant and giving birth to a baby. For example, on January 30, 2002,—alleged onset of disability is not until April 2, 2002— Ms. Sullivan wrote: "Her husband is on disability for COPD. Her 16 year old daughter is six months pregnant. There have been significant behavior problems with her stepsons. Dolly is working about 15 hours a week at the nursing home and she feels this is about all she can handle since she takes care of her husband and runs the household." Tr. at 265. On February 21, 2002—again, before the alleged onset of disability—Dr. Daniel wrote: "Both Donna and I agree that Dolly is unable to cope with all of the stresses and responsibilities at home and work full-time and yet we feel that working part-time is beneficial for her in terms of getting away from some of the issues at home, giving her some money that she has earned, etc." Tr. at 262.

On June 7, 2004, Dr. Daniel wrote a report addressed to the Office of Hearings and Appeals. He stated that the current diagnoses were: 1) Post Traumatic Stress Disorder, chronic with moderate to sometimes severe symptoms ... At times she experiences nightmares and flashbacks which can be quite incapacitating for her; 2) Dysthymia Disorder, adolescent onset. Even with treatment including medication she experiences significant anxiety and depressive symptoms including frequent difficulty sleeping, decreased energy and easy fatigability, agitation and significant difficulty in concentrating. The psychologist wrote that Plaintiff alcohol dependence had been in "sustained full remission for the past three years." Tr. at 326. Dr. Daniel concluded his report:

> Even if she did not have other stressors at home, if she would attempt to work I think there would be a marked exacerbation of her anxiety and depressive symptoms. This is already exemplified in the difficulty she has in dealing with current life stressors. I think that it is virtually certain that she would miss significant work because of her symptoms, would be unable to concentrate adequately at work on a consistent basis, and would exhibit angry outbursts at work. It is also my opinion that there would be a strong likelihood of recidivism in terms of returning to excessive drinking resulting in the need for substance abuse treatment/hospitalization. I think that this is a woman who would very much like to be able to work but I don't believe she is capable of doing so. Requiring her to attempt to work full-time would almost certainly result in increased treatment costs.

Tr. at 327.

## ADMINISTRATIVE HEARING

Plaintiff, with counsel, appeared and testified at the hearing on June 22, 2004. Tr. at 334–63. Plaintiff testified that she was 43 years old. Tr. at 337. Plaintiff testified that before she stopped working she would fly off the handle, that if she was told to do something, she would "start bawling and [lose] my temper." Tr. at 342.

Plaintiff testified that her husband did the budgeting for the family but that she delivered the bills for payment and did the shopping. Tr. at 344.

Plaintiff testified that her husband was disabled from COPD. She said that her care of him involves bathing him, cooking his meals, and making sure he takes his medication. Tr. at 346. Plaintiff said that she also baby sits for her grandchild two or three times per week. Tr. at 348. Care of the grandchild involves feeding, entertaining, changing diapers. Plaintiff said that she sometimes takes the child to the park. Tr. at 349.

The ALJ asked Plaintiff if she thought she could take care of all her household duties and work at the same time. Plaintiff said that she had found it to be too much. Tr. at 350. The ALJ asked why Plaintiff had chosen to stay home rather than work outside of her home. "I thought the one at home took priority," was the response. Plaintiff agreed that she could have had someone come in and take care of her husband:

> Q. ... you could get someone to come in and take care of your husband, couldn't you?
>
> A. Yeah.
>
> Q. And they'd pay somebody to do that, wouldn't they?
>
> A. Yeah.
>
> Q. Okay, so why did you decide that was a priority then?
>
> A. Out of love.
>
> Q. Okay. You felt it was your duty to do that?

A. Yeah.

Tr. at 351.

Plaintiff testified that she had three years of sobriety. She said that she felt her alcohol problems were in response to the abuse she suffered as a child. Plaintiff said that she received medical care at the mental health center and from her family doctor. Tr. at 352.

After Plaintiff testified, the ALJ called Julie Svec to testify as a vocational expert. Tr. at 357. The vocational expert was asked to consider:

We have a 42 year old with a GED certificate. She's really not alleging any physical problems. She has to be able to do medium work activity, medium, light and sedentary without any restrictions on sitting, standing, walking, stooping, crouching, crawling, kneeling, etcetera. The record indicates she does have a dysthymic disorder. She's kind of over-stressed. She takes care of her disabled husband and she runs a household. She does engage in many normal daily activities, including driving, shopping, cooking, cleaning, taking care of a 2-year old grandchild, goes to church on Sunday, goes to a Wednesday night prayer group and basically uses the community mental health center as an opportunity to express her feelings, to relate with another understanding adult and to basically unwind. Her depression would not significantly interfere with her ability to function independently, appropriately and effectively in a competitive job market on a sustained basis. She has no restriction in her activities of daily living. Obviously her social functioning is intact. She's able to attend church on Sunday, attend a prayer group on Wednesday evening. There's nothing to indicate she would have any difficulty with concentration, persistence or pace. Thus on a scale of none to extreme, I would indicate that

her dysthymic disorder would be mild, at times moderately impaired depending upon how stressed she is. She made the choice to stay at home and deal with the home stresses rather than the work stresses. With those restrictions, would she be able to do any work she's done in the past?

Tr. at 357–58. In response the vocational expert testified that Plaintiff would be able to do her past relevant work. Tr. at 358.

On cross examination, the vocational expert testified that if Plaintiff were not able to deal with supervisors or co-workers, she would be unable to do any kind of work. Tr. at 359. The vocational expert testified that if a person would miss work three times a month due to mental health impairments, that person could not work. Tr. at 359–60.

### ALJ'S DECISION

In her decision of October 26, 2004, as stated above, the ALJ stopped the sequential evaluation at the fourth step by finding that Plaintiff is able to do her past relevant work. The ALJ wrote that while she considered Dr. Daniel's opinion, she did not find it persuasive.

While Dr. Daniel reported that the claimant's anxiety and depression limited her from working, he has not stated what limitations she had due to those impairments. Even more, it is noted that the most current GAF score revealed only moderate symptoms due to her impairments. (Exhibit 12F, p. 1). Again, this does not support a claim for disability.

Tr. at 17. The ALJ, wrote that Plaintiff's "depression does not significantly interfere with her ability to function independently, appropriately and effectively in a competitive job market on a sustained basis. She has no restriction in activities of daily living. Her social functioning is intact and

she has no difficulties with concentration, persistence or pace." *Id.*

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

The Court of Appeals held, as cited above, that if two inconsistent positions are possible and one represents the Secretary's findings, the Court must affirm. On the other hand, the Court is obligated to apply a balancing test to evidence which is contradictory in order to determine if the decision of the Commissioner is supported by substantial evidence on the record as a whole. In *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987), then Chief Judge Lay wrote:

"substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. *Smith v. Heckler,* 735 F.2d 312, 315 (8th Cir.1984). In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test which is contradictory. *See Steadman v. Securities and Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981). It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.

In the case at bar, the ALJ's view of the evidence has support in the record. In her testimony, and throughout the record, Plaintiff states that she cannot cope with both the demands of work and the demands of her responsibilities at home. According to Plaintiff, when she was forced to choose between working and taking care of her husband, she opted to stay at home. Likewise, as pointed out in the summary of fact above, some of the medical records suggest that but for the stressors Plaintiff experiences at home, she would be able to work. This is especially true of the treatment notes before Plaintiff's alleged onset of disability.

On the other hand, treating psychologist John Daniel, Ph.D., opined on four sepa-

rate occasions that Plaintiff would be unable to function in a competitive work setting. Once was shortly after Plaintiff made her application for disability benefits on June 12, 2002. Tr. at 186–87. On November 18, 2002 (Tr. at 252–53), and again on October 27, 2003 (Tr. at 252), Dr. Daniel wrote to Plaintiff's counsel to express his opinion that Plaintiff is unable to work. Finally, on June 7, 2004, Dr. Daniel sent a letter directly to the Office of Hearings and Appeals stating his opinion that even absent the home stressors, Plaintiff is not able to work due to her anxiety and depression. Tr. at 327.

Claimants often do not have insight into the reasons they are unable to work, especially when mental health illness are involved. For example, in *Easter v. Bowen,* 867 F.2d 1128 (8th Cir.1989), it was claimed that Mrs. Easter was unable to work due to a long list of impairments. Although the objective evidence of the physical ailments was of varying degrees of certainty and specificity, there was uncontradicted evidence of a mental condition known as somatoform or conversion disorder. The medical record also indicated depression, chronic insomnia and extreme fatigue, a low frustration tolerance level, and possibly a deficiency of logical memory function. *Id.* at 1129. The Court of Appeals held that it was error for the ALJ to substitute his judgment about Easter's condition for the judgment of both the treating and consulting physicians. Furthermore, the ALJ rejected the opinion of the vocational expert who answered that no work would be possible when asked to consider the opinions of the doctors. In *Easter,* Judge Arnold concluded the opinion by reminding courts of their duty to "evaluate all of the evidence in the record taking into account whatever in the record fairly detracts from the ALJ's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Piercy v. Bowen,* 835 F.2d 190, 191 (8th Cir.1987)." The Court reversed and awarded benefits. *Id.* at 1131.

■ In the case at bar, the ALJ substituted her judgment of the nature and effects of Plaintiff's impairments for that of the only medical expert to submit reports on Plaintiff's condition. Dr. Daniel, a licenced clinical psychologist, made it very clear that even if Plaintiff did not have other stressors at home, an attempt to work would result in "a marked exacerbation of her anxiety and depressive symptoms." Relying on Plaintiff's view of her own illness, the ALJ told the vocational expert to consider that Plaintiff was "kind of over-stressed." The vocational expert was told that Plaintiff's "depression would not significantly interfere with her ability to function independently, appropriately and effectively in a competitive job market on a sustained basis." Under those circumstances, the vocational expert testified that Plaintiff was able to do her past work.

The vocational expert's testimony, however, did not withstand cross-examination. When the expert was asked to consider the effects of Plaintiff's illness identified by her doctors, the expert testified that no work would be possible.

■ Substantial evidence on the record as a whole does not support the ALJ's decision that Plaintiff is able to return to her past relevant work. When the vocational expert was asked to consider the true extent of Plaintiff's limitations, she testified that no work is possible. The Court, therefore, finds no reason to remand for any purpose other than to compute Plaintiff's past due benefits. In so holding, the Court is aware that Plaintiff is a relatively young woman. In *Easter,* Judge Arnold closed the opinion: "We note that this claimant's condition may be remediable with treatment, and remind the Secretary of his authority to terminate her

**780**

benefits if she fails to pursue prescribed treatment that, to a reasonable degree of medical certainty, would restore her ability to work. 20 C.F.R. § 404.1530."

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b) [2]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

[2.] N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."